JOSEPH STERN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAMUEL STERN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5887, 5943. Promulgated December 19, 1928.

*S. A. Hays, Esq.*, for the petitioners.
*J. Harry Byrne, Esq.*, for the respondent.

**OPINION.**

TRUSSELL: The first issue presented is the correctness of respondent's determination of a profit to the partnership in the sale in 1918 and 1919 of certain tracts of coal land. As to five of these tracts, indicated in the findings of fact as numbers 1 to 5, it is agreed that they were acquired by the partnership prior to March 1, 1913. As to tracts Nos. 6 and 7, respondent insists that these were acquired after that date, this fact being evidenced by the dates of the two deeds of record, one dated in August and the other in December, 1913.

For the purpose of determining profit or loss on the subsequent sales of these properties it seems unimportant whether or not the legal title had passed to petitioners on March 1, 1913, for on that

date they had a definite equitable interest in the property in consequence of the execution of contracts for the purchase thereof at a fixed price and the payment of a portion of the purchase price. On that date the ripening of their interest into a fee simple merely awaited the execution of the deeds and the payment of the balance of the purchase price to be made at that time. It is clearly indicated that the parties considered the actual purchase as consummated at the time the initial payment was made. Petitioners thereafter treated the lands as already acquired and prior to the delivery of the deeds entered into contracts to sell them and paid taxes on them for the year 1913. We think these properties were " acquired before March 1, 1913," within the meaning of section 202 of the Revenue Act of 1918. Cf. *Appalachian Realty Co.*, 12 B. T. A. 52.

On the question of the March 1, 1913, fair market value all of these seven tracts of land, the record shows that there was activity in the market for coal lands in Cumberland Township, Green County, Pennsylvania, during the latter part of the year 1912 and during the year 1913. A number of sales of such land were made at prices above those obtained for similar lands in that section in preceding years. This activity appears to have been due in a large measure to the operations of one J. V. Thompson, who was buying up many smaller tracts, combining them and selling to the large coal operators. All of the sales were not to or by Thompson, his operations having the effect of stimulating the market generally. Consideration of the testimony leaves us in no doubt that a genuine market for coal lands of the character of petitioners' and in that vicinity existed during this period with prices at a level above those prevailing before that time.

The record shows, as evidence of the market for these lands in that section, that early in 1913 J. V. Thompson sold 5,500 acres of land for an average of $784 per acre. This property adjoined the lands here involved but had a river frontage. Late in 1912 the Youngstown Sheet & Tube Co. purchased 4,800 acres adjoining the lands here involved for $650 per acre. This property also extended to the river. Late in 1912 a tract of 100 acres on the river was sold at $1,000 per acre. On March 8, 1913, one Laidley sold for an average price of $700 per acre a tract of 198 acres 1½ miles from the river. As far back as August, 1911, Thomas Ingram sold for an average price of $636.94 a tract of 157 acres located 3½ miles from the river.

It is shown that Thompson in the latter part of 1913 became insolvent and his holdings of coal lands were thrown on the market by his trustees and a considerable depression resulted which had the effect of reducing the market prices for such lands in this vicinity

to a level below those obtaining in 1910, 1911, and 1912. This depression existed for several years.

. Petitioners had bought the seven tracts here involved at various times prior to March 1, 1913. The respondent in his determination fixed a fair market value on these as of that date of $500 per acre. For the largest one of these tracts petitioners had paid $525 per acre in March, 1911. For two others they had paid $495 and $500 per acre in the latter part of 1912 and for two others $500 per acre in 1909. For one of the remaining two tracts they had paid $437 per acre in January, 1910, and in the case of the other, purchased in 1909, the price is not shown but it lay adjacent to other lands belonging to petitioners which they sold at $650 per acre in 1913.

The last mentioned tract was sold by petitioners in the year 1919 at $600 per acre. The other tracts they sold together for $575 per acre in 1918 and under the proof we can not but conclude that the fair market value on March 1, 1913, of all of the several tracts was above the average cost shown. Considering the fact that petitioners' lands involved herein have no river frontage and constituted in all only a small acreage, their fair market value on that date is not measured by the price obtained for certain large tracts as testified to in the record. We think their fair market value on March 1, 1913, was $525 per acre.

The second issue is upon the disallowance by respondent of certain deductions in the years 1917, 1918, and 1919, by the partnership of Stern Brothers and representing interest paid in those years on indebtedness incurred for the purchase of coal lands.

It is shown that Stern Brothers operated two separate and distinct businesses, wholly different in character, one a retail mercantile business and the other a business of buying and selling coal lands. The accounts of the two businesses were kept separate and distinct and one of the partners devoted his entire time to the coal-land business in which was invested approximately two-thirds of the partnership funds.

The mercantile business extended credit and maintained inventories and consequently kept its accounts on an accrual basis. The coal-land-business accounts were kept on a strictly cash basis, only actual payments and collections being entered and these as of the date when made or received. At no time did the books of the coal-land business show its outstanding indebtedness either as to principal or interest. This method of keeping the accounts had been regularly and consistently followed for many years.

In the taxable years here involved Stern Brothers, in the operation of its coal-land business, made .interest payments amounting to $22,933.19 in 1917, $29,919.12 in 1918, and $12,541.25 in 1919, and

took credit in those years for the payments made in computing its net earnings for those years distributable to petitioners.

Respondent in disallowing part of the interest paid in each of the years in question takes the position that the fact that the mercantile business operated by Stern Brothers was on an accrual basis, and necessarily kept its accounts on such basis to properly reflect income, precluded the keeping of the coal-land-business accounts on any other basis. It is insisted that, as the two businesses belonged to the same partnership, they constituted the one business of Stern Brothers, and two different systems of accounting for income could not be used.

We have held on various occasions heretofore that a business can not keep its books on a hybrid basis, partially cash and partially accrual. See *Comstock-Castle Stove Co.*, 4 B. T. A. 114, and *Maine Dairy Co.*, 4 B. T. A. 375. The reason for such holding was that such a method resulted in a distortion of income as not being a regular and consistent method but leaving it uncertain as to how various items might be treated, and making it difficult, if not impossible, to verify the correctness of the result.

However, the case before us is wholly different. Here, we have two distinct businesses of an entirely different character, owned by the same individuals but operated independently and keeping separate accounts. The basis of the conclusion reached by us in the cases cited above was the necessity to require methods of accounting which would clearly reflect income. To so construe those decisions as to lay down a hard and fast rule requiring every business owned by the same individual or the same partnership to use the same method of accounting irrespective of whether it correctly reflects income would be to defeat the object sought.

In the case before us the two businesses are distinct, separate, and of different character, and maintain separate accounts. We see no objection to the accounts of the coal-land business being kept on a cash basis if its income was thereby correctly reflected, and in determining whether or not that was the case it must be kept in mind that the accounts in question have been kept on this basis for many years and the fact that it was the regular, established, and consistently followed method, is not disputed. Unless it is clear that it did not accurately reflect the income received it should not be disturbed.

On this question we have considered the evidence carefully and can find no indication that the cash method was not a correct and proper one for this coal-land business. We can not assume that it was incorrect merely because some of the items of expense paid in one year are shown to have been liabilities of prior years. The character of the business as shown by the proof is such as to indicate that the method used was the proper one. The adjustment made by respond-

ent by merely allocating to prior years a portion of the interest paid in the taxable years was a manifest distortion of income when we consider that there was in each of those years an average of more than $180,000 of outstanding indebtedness of the business, but carrying interest during those years, which would be later paid, for which credit, as an accrued expense, was denied by the adjustment, because such indebtedness did not appear on the books as kept on a cash basis.

The several deficiencies should be redetermined in accord with the foregoing findings of fact and opinion.

Reviewed by the Board.

*Judgment will be entered pursuant to Rule 50.*