Almac's Inc. v. Commissioner.
Almac's, Inc. v. Commissioner
Docket No. 78386.
United States Tax Court
T.C. Memo 1961-13; 1961 Tax Ct. Memo LEXIS 336; 20 T.C.M. (CCH) 56; T.C.M. (RIA) 61013; January 24, 1961
Walter F. Gibbons, Esq., Industrial Bank Bldg., Providence, R. I., and Joseph G. Kinder, Esq., for the petitioner. Charles T. Shea, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the year 1956 in the amount of $20,713.94. The questions for decision are (1) whether the Commissioner properly disallowed a claimed loss on the sale of a building and (2) whether the Commissioner properly determined that certain expenditures were capital in nature rather than ordinary *337 and necessary business expenses. Findings of Fact Some of the facts are stipulated, are so found and the stipulation of facts is included herein by this reference. The petitioner is a Rhode Island corporation with its principal offices during the taxable year in Providence, Rhode Island. Its income tax return for the calendar year 1956 was filed in the office of the district director of internal revenue for the district of Rhode Island. At all material times it kept its books of account and filed its income tax returns on the accrual basis, and its taxable year was the calendar year. Petitioner is, and at all material times has been, engaged in the operation of a chain of supermarkets located in Rhode Island and Massachusetts. Allen W. Pike is, and during the taxable year involved was, its president and sole stockholder. Seekonk Land Company is a corporation engaged in the business of holding real estate. Allen W. Pike is the sole stockholder and president of Seekonk Land Company. On November 2, 1956, Seekonk Land Company as purchaser, by Allen W. Pike as president, entered into an agreement with John Bellegris and others as sellers providing for the purchase and sale of *338 certain real estate and personal property located in Attleboro, Massachusetts, for a consideration of $52,500. The property covered by the agreement consisted of a parcel of land of approximately 120,000 square feet with a frontage of 150 feet on Washington Street in the City of Attleboro, together with a large restaurant building located thereon, restaurant equipment and a liquor license. Pursuant to the terms of the agreement the transfer of the liquor license was subject to the necessary permission of the licensing commission. The assessed value of the property covered by the agreement as of January 1, 1956, as assessed by the City of Attleboro for the purposes of local taxation, was as follows: Land
$ 8,600.00
Buildings
39,400.00
Personal Property
5,000.00
The assessed value of the land, as of January 1, 1957, was $8,600. On November 23, 1956, title to the property agreed to be sold was transferred to the petitioner. It was at all times the intention of Seekonk Land Company, the petitioner, and Allen W. Pike, as president and sole stockholder of both companies, that title to the property covered by the agreement of purchase and sale be taken in the name *339 of the petitioner. The agreement was entered into by Seekonk Land Company in order to conceal from petitioner's competitor's the fact that it was purchasing the property. Closing costs, consisting of title policy premium recording expense, amounted to $336, resulting in a total cost for the property so acquired in the amount of $52,836. Thereafter petitioner received an opinion from a real estate broker of Providence, Rhode Island, that the fair market value of the building acquired as of the date of acquisition was $39,400 and that the assessed value of the property acquired was an equitable basis for allocating the purchase price among the various assets. Pursuant thereto the aggregate purchase price was allocated on petitioner's books as follows: Land
$ 8,600.00
Buildings
39,400.00
Personal Property
4,836.00
$52,836.00
At the time the contract of purchase was entered into and until late in November 1956, it was the intention of petitioner to move the restaurant building to the southerly end of the parcel of real estate, to redecorate it and thereafter to rent or lease the building to a restaurant operator for operation as a restaurant, and to construct *340 a supermarket either at the northerly end of the property or approximately in the middle of the property, with a mutual parking area for both businesses. This intention was discussed with a number of restaurant operators and other individuals connected with the restaurant business after the date the agreement to purchase was entered into. Sketches or drawings were prepared in connection with the relocation of the restaurant building and in connection with laying out the planned parking area. Placards were posted on the premises stating that the restaurant was temporarily closed for remodeling and relocation. Shortly after petitioner executed the contract to purchase the property it engaged an architect to design the new store building and contacted a contractor to submit a price for moving the existing restaurant building. The contractor, in whom petitioner's president had great confidence, inspected the building and reported to petitioner that due to the construction of the restaurant building it was not practical, feasible or economical to attempt to move it. After receiving this opinion petitioner decided to abandon the plan for relocating the restaurant building and determined *341 to sell the building and all the restaurant equipment located therein immediately. On December 5, 1956, the building and restaurant equipment were sold at public auction for $8,929.14. Expenses of the auction were $1,522.84, resulting in net proceeds of $7,406.30. Petitioner was advised that it was legally impossible to sell the liquor license and, accordingly, did nothing with it. Subsequently a supermarket was constructed upon a portion of the land. In 1955 the restaurant building was in poor condition. Thereafter and prior to petitioner's acquisition extensive repairs and improvements were made by petitioner's sellers inside and outside. When petitioner purchased the property the condition of the restaurant building and restaurant equipment was very good. The restaurant was in operation almost up to the time of closing. The restaurant would accommodate between five hundred and seven hundred people, had three heating plants, was completely air-conditioned and sprinklered. A proper allocation of the purchase price of the assets acquired by the petitioner pursuant to the contract of November 2, 1956, is Land
$ 8,600.00
Buildings
39,400.00
Personal Property
4,836.00
*342 In 1956 petitioner incurred and paid an expenditure of $1,935.50 in connection with retubing a boiler at its Park Street store in Woonsocket, Rhode Island. The building in which the boiler was located was formerly a transit company carbarn and was purchased and remodeled by petitioner in 1955 for use as a supermarket. The boiler had been installed in 1929. It was of very large capacity because the carbarn had large overhead doors at both ends. Under the conditions of petitioner's use the boiler boiler tubes carbonized rapidly and during the first heating season after petitioner's acquisition six or seven tubes leaked. Upon advice of petitioner's heating engineer, petitioner retubed the boiler in 1956 at a cost of $1,935.50 as a calculated risk that the boiler shell would last. In 1956 petitioner incurred and paid expenditures in the amount of $1,930.50 in repairing a sidewalk curb-cut at the truck entrance to petitioner's rented warehouse and in resurfacing a portion of a parking area at the same location. With respect to the sidewalk repair the truck entrance had been installed about one year and a half before the repairs were made. The sidewalk, however, had a bad hump in it *343 which caused a shifting of loads in the trucks turning into the entrance and it was necessary to reconstruct this portion of the sidewalk. As to the parking area a portion of it had begun to pit as a result of wear and tear and while the contractor was repairing the sidewalk he also resurfaced the worn portions of the parking area. This work was done in order to keep it in condition for parking automobiles and to prevent further deterioration. In 1956 petitioner also incurred and paid expenditures in the amount of $714.25 in erecting a plywood and wire partition in the warehouse in order than an alarm system could be installed to protect the tobacco inventory. In the statement accompanying the notice of deficiency the following explanations appear: It has been determined that you have failed to establish that you sustained a loss in any amount on the disposal of buildings and equipment on or about December 12, 1956. Accordingly, the loss reported on your income tax return for the taxable year 1956 in the amount of $36,829.70, as the loss due to the disposal of that property, has been disallowed. It has been determined that expenses incurred by you in replacing boiler tubes, *344 resurfacing sidewalks and a parking area, and installing of partitions in a warehouse, are capital expenditures. The amount of $4,580.25, attributable to these items, which was deducted on your income tax return for the taxable year 1956, has therefore been disallowed. Opinion With respect to the claimed loss on the sale of the restaurant building and equipment it is the Commissioner's contention that petitioner is not entitled to the loss because it was the intention of the petitioner at the time of acquisition to demolish the building and equipment. The short answer to this contention is that the record, as we view it, bears out the position of the petitioner instead of the Commissioner. We are convinced that from the time the contract to purchase the real property and the building was executed, up to a very short time before the deed was actually executed and delivered, the petitioner fully intended not to demolish the restaurant, but to move it to another part of the real estate and to continue its operation as a restaurant by leasing to an outside restaurateur. So far as the date of acquisition is concerned, the Commissioner's argument that the date of the deed rather than *345 the date of the purchase contract is controlling is without merit. From the time the contract was executed on November 2, 1956, the petitioner had a "definite equitable interest in the property" and the execution of the deed and payment of the balance simply ripened the petitioner's interest into a fee simple. Joseph Stern et al., 14 B.T.A. 838. The intention to make continued use of the building for business purposes existed until it was abandoned late in November 1956 in reliance on engineering and architectural advice that it would be uneconomical and infeasible to move the building as contemplated. We hold that petitioner had no intention of demolishing the building at the time of acquisition. Accordingly, section 1.165-3(b) Income Tax Regs., which applies to so-called demolition losses under section 165(a), I.R.C. 1954 is inapplicable. The remaining problem is to determine the amount of the loss to which petitioner is entitled. This requires an allocation of the purchase price of the property, which was fixed in the contract as a lump sum, between land and buildings and equipment. The petitioner based its allocation *346 on the advice of an expert real estate man and geared it to the allocation made in the assessment for local taxes. The law of Massachusetts requires the assessors to "make a fair cash valuation of all the estate, real and personal, subject to taxation * * *", ch. 59, sec. 38, Mass. Ann. Laws, and the "fair cash value" as used in the Massachusetts statutes has been held to mean "fair market value, which is the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy". Boston Gas Co. v. Assessors of Boston, 334 Mass. 549; 137 N.E. 2d 462. While we do not think the assessed valuation is necessarily controlling for our purpose, we do think it is entitled to be given weight. This is especially true where, as here, the assessed values very nearly accord with and are buttressed by expert testimony with reference to a reasonable allocation of the purchase price. Applying our best judgment to the facts of record we have found that the total purchase price was properly allocable $44,236 to the building and equipment *347 and $8,600 to the land. The petitioner's loss is to be computed accordingly. With reference to the expenditure of $1,935.50 for retubing the boiler which the Commissioner determined to be a capital expenditure, the petitioner has not carried its burden of proving the determination to be in error. There is no showing as to the relative costs of replacing the entire boiler or how extensive a job it was to retube. We think the retubing undoubtedly added to the useful life of the boiler, and that, by more than a year or so. The cost was properly capitalized by the Commissioner. On the other hand we think that the expenditures made for work done to take the hump out of the truck entrance, to replace part of the sidewalk at the entrance and to resurface a portion of a parking area constitute repair and ordinary maintenance and are properly deductible as expenses. The issue with reference to the third claimed expenditure, that for erecting partitions in petitioner's warehouse, has been abandoned by the petitioner. Decision will be entered under Rule 50.