HERMAN KLAYMAN and SHIRLEY KLAYMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent BENJAMIN KLAYMAN and SALLY KLAYMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klayman v. Commissioner
Docket Nos. 4595-69, 4596-69.
United States Tax Court
T.C. Memo 1973-200; 1973 Tax Ct. Memo LEXIS 90; 32 T.C.M. (CCH) 930; T.C.M. (RIA) 73200; September 10, 1973, Filed Thomas B. Rutter, for the petitioners. Mary Ann Hagan, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined deficiencies in the Federal income taxes of the petitioners as follows: 2 Docket Number
Petitioner
1962
1965
1966 4595-69
Herman Klayman & Shirley Klayman
$1,099.52
$12,219.23
$3,687.29
4596-69
Benjamin Klayman & Sally Klayman
10,577.09
2,641.36
Upon joint motions of the parties *91 these cases were consolidated for trial, briefs and opinion. The issue for decision is whether petitioners purchased certain buildings with the intent to demolish the buildings so that the demolition losses of $132,404.29 and $26,860. for the respective years of 1965 and 1966 were improper deductions for the purposes of computing partnership income. [1] The amount of the deduction for the demolition loss is not in dispute. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits, are incorporated herein by this reference. Petitioners Herman and Shirley Klayman are husband and wife. At the time of the filing of their petition 3 they resided in Penn Valley, Pa. They filed their joint Federal income tax returns for the taxable years 1962, 1965 and 1966 with the district director of internal revenue at Philadelphia, Pa. Petitioners Benjamin and Sally Klayman are husband and wife. At the time of the filing of their petition they resided in Broomall, *92 Pa. They filed their joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue at Philadelphia, Pa. For a number of generations the Klayman family has been engaged in the business of slaughtering and processing hogs for sale to retail outlets. Prior to the taxable years in question they operated a hog abattoir, known in common parlance as a slaughterhouse and pork packing plant at 876 N. 48th Street (48th Street Property), Philadelphia, Pa. under the name of I. Klayman & Co., Inc. (Klayman Co.). Herman Klayman is the general manager of Klayman Co., and as such has total responsibility for the daily operations of the company. Herman Klayman, together with Benjamin Klayman and Isadore Klayman (Partnership) were partners in a real estate venture, the sole business of which was leasing 4 its property to Klayman Co. Benjamin Klayman is the brother of Isadore Klayman, who is the father of Herman Klayman. The 48th Street Property was located in the West Mill Creek Redevelopment Project in Philadelphia. For some time prior to 1964, the Partnership was aware that the 48th Street Property would be condemned by the Redevelopment *93 Authority of Philadelphia. In anticipation of the condemnation, the partners began investigating potential sites for relocation. Having encountered numerous problems in dealing with the City of Philadelphia, the partners investigated several sites outside the city including Wilmington, Del. and Westville, N.J. The Partnership was unable to arrive at a mutually satisfactory arrangement in either Wilmington or Westville and returned to searching the Philadelphia area for a site. Part of the problem of locating a suitable relocation site was the requirement that an abattoir could only be operated, in most instances, in an area zoned "least restricted." The Partnership was contacted by the City of Chester, Pa. concerning the possibility of relocating the plant in that city. The offer made by Chester was attractive and 5 the Partnership was asked, as an act of good faith, to deposit $10,000 as an escrow by November 5, 1964. From the beginning of the partners' efforts to find a suitable site for relocation, they had been assisted in varying degrees by the Philadelphia Industrial Development Corporation (PIDC). PIDC is a nonprofit organization organized for the purposes of *94 retaining local industries in the city by helping them to acquire larger or modern plant space and of attracting new industries to the City of Philadelphia. The Partnership, and in particular, Herman Klayman, was dissatisfied with the efforts of PIDC and the City of Philadelphia regarding their proffer of assistance in locating a new plant. Nevertheless, on November 4, 1964, the day prior to the date when the escrow to Chester, Pa. had to be deposited, Herman Klayman was contacted by an employee of PIDC and asked to view a potential site within the City of Philadelphia. Herman Klayman reluctantly visited the site on November 4, 1964. The property was located at 5701 Tacony Street (Tacony Property) and consisted of land and numerous unoccupied buildings which were formerly 6 utilized by the International Shoe Company as a leather tannery. [2]
Herman Klayman had previously considered the Tacony Property as a possible site but had rejected the idea because the owner, Mack Warehouse Corporation (Mack), was asking a price for the land higher than the Partnership wanted to pay. One of the *95 officials showing the site to Herman Klayman suggested that the owner might be willing to take substantially less money than before and pointed out that the buildings on the property could be renovated. The official also suggested that the Partnership could utilize PIDC as a nominee title holder and take advantage of a lower bank interest rate than would otherwise be available. Herman Klayman inspected the buildings on November 4, 1964. He determined that the buildings were in good structural condition and possessed many characteristics favorable to an abattoir, such as high ceilings, heavy duty walls and concrete floor drainage. There were broken windows and other cosmetic defacements due to their disuse, but he felt certain that they could be rehabilitated. 7 The Partnership had previously renovated the 48th Street Property from a cluster of warehouses and was generally familiar with the requirements of establishing a slaughterhouse operation. After deliberations by the partners, the Partnership made an offer to the owner of the Tacony Property on November 4, 1964, which had to be accepted the same day because the Partnership had promised to deliver the $10,000 escrow *96 deposit for the site in Chester, Pa. on November 5, 1964. The owner accepted the offer and an agreement dated November 4, 1964, was executed between Mack as the seller and Isador and Herman Klayman as the buyers. It was prepared on a printed agreement form with 12 numbered printed paragraphs and space for inserting additional paragraphs before, between and after the 12 printed paragraphs. Immediately after the agreement was signed, the Partnership contacted an architect, Angelo R. Aquaro, who specialized in designing meat processing plants. The architect and the Klaymans visited the Tacony Property on November 5, 1964, at which time the architect took photographs of the site and was instructed to prepare a cost estimate of the various alterations required. 8 On November 6, 1964, the architect confirmed his discussions with the Klaymans by letter as follows: In accordance with your instructions, we will procede [sic] to prepare schematic studies and preliminary cost estimates for the conversion of the existing buildings to house your proposed new hog slaughtering and cutting operations. Herman Klayman immediately began negotiating financial arrangements because the *97 time to vacate the 48th Street Property was imminent. On November 13, 1964, the architect submitted his first cost breakdown of the proposed remodeling. To the horror of the Partnership, the cost of remodeling was only 10 percent less than tearing down all of the buildings and constructing a new abattoir. The total cost estimate was far in excess of that contemplated by the Partnership at the time they offered to purchase the Tacony Property. After receiving the cost estimate and consulting with his architect, Herman Klayman contacted his attorney and proposed that the attorney contact the seller, Mack, to ascertain if the seller would be willing to share in the excessive demolition costs if such became necessary. The seller informed Klayman's attorney that there was no problem because, prior to the sale, they were contemplating 9 a demolition and had gone so far as to obtain a bid from a local demolition firm. The seller agreed to "assign" the bid, if possible, and if not, to indemnify the buyer for demolition costs over and above the bid estimate of $49,500. This additional agreement was inserted in the agreement of November 4, 1964 as paragraph 13 sometime near the middle *98 of November, 1964. It provided as follows: 13. Seller agrees to produce a contract signed by Geppert Brothers, Inc. in which Geppert will agree to demolish all buildings except water tank on the premises, and fill in the vat pits with concrete and brick batts to bring site to existing grade and all excess material will be removed, for a price not to exceed $49,500. If there is a further charge for removing excess material, it will be borne by Seller. If the said contract with Geppert Brothers, Inc. is signed by Buyers and Geppert does not perform in accordance with the agreement, Seller will bear any costs in excess of the $49,500. Paragraph 12(a) of the agreement is as follows: (a) that the zoning classification of the above described property is LEAST RESTRICTED, except for the 30 ft. strip extending from Tacony St., a depth of 543 ft.,* *which is zoned G-2 Industrial. With adequate financing having been arranged, PIDC took title to the Tacony Property on December 16, 1964. 10 PIDC, in turn, entered into an installment sale agreement with the partners which PIDC assigned to Girard Trust Bank, the ultimate mortgagee in the transaction. As part of its usual procedures, *99 PIDC maintained business records of its dealings with the Partnership. The PIDC file contained numerous memoranda, news releases, a copy of the installment sale agreement with the partners and an unidentified scrap of paper dated November 11, 1964, which reads as follows: [NOTE: handwritten in original] 10 a 11/8/64 Klayman Building 1,000,000 Machinery 500,000 Condemnation $379,000 net 350,000 land 220,000 demolition 50,000 1,000,000 1,270,000 350,000 825 C. Penn 65% 445,000 Seidle - Keenan Call Seidle on Klayman 11 November 8, 1964, the date on the scrap of paper fell on Sunday. PIDC was used as a nominee in order to obtain lower interest rates with the financing bank. Faced with excessive remodeling costs and the reluctance of contractors to give "closed end" bids, the Partnership arrived at a compromise solution with their architect which included extensive demolition of many of the existing structures. As a result of the compromise renovation plan, nine of the buildings were demolished. The Partnership ultimately completed the remodeling using a different contracting firm for the demolition other than the one originally under bid to *100 the seller. The agreement between the contractor and Klayman Co. was executed on December 31, 1964.After the extensive remodeling was completed, Klayman Co. transferred its operations to the Tacony Property. In 1966, it was discovered that other demolition work was necessary in order to accommodate the increasing volume of business of Klayman Co. The additional demolition consisted of destroying one-half of a preexisting building in order to make room for the increasing number of livestock trailers which made daily deliveries to the plant. 12 OPINION The issue for decision is whether the petitioners purchased the Tacony Property with the intent to demolish the buildings thereupon. Section 165(a), Internal Revenue Code of 1954, as amended, provides generally that "there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1.165-3(a) (1), Income Tax Regs., provides that no deduction for demolition loss shall be allowed when the "property is purchased *101 with the intention of demolishing either immediately or subsequently the buildings situated thereupon." [3]Section 1.165-3(b) (1), Income Tax Regs., provides that a deduction shall be allowed "if the demolition occurs as a result of a plan formed subsequent 13 to the acquisition of the buildings demolished." [4]
*102 Section 165-3(c) (2) and (3), Income Tax Regs., sets forth various factors, all of which must be considered in the totality of the circumstances of the individual case, to be used in determining the factual question of intent. [5] Petitioners do not question the validity of the regulations. *103 14 The determination of intent is necessarily a question of fact and depends upon an examination of all the surrounding facts and circumstances. United States v. Ivey, 294 F.2d 799, 807 (C.A. 5, 1961); sec. 1.165-3(c) (1), Income Tax Regs.[6]
*104 15 The issue for decision is whether the petitioners intended to demolish the buildings in question at the time of acquisition. The date upon which the petitioners acquired an equitable interest in the property is the date of the execution of the agreement of November 4, 1964. This date is the date of acquisition for purposes of determining intent to demolish. Joseph Stern, 14 B.T.A. 838 (1928); First Nat. Bank & Trust Co. of Chickasha v. United States, 462 F.2d 908 (C.A. 10, 1972), affirming 329 F. Supp. 1147 (W.D. Okla. 1971). 16 Respondent argues that the Partnership did not have equitable title to the property because paragraph 13 of the agreement was added after November 4, 1964, and Mr. Klayman repudiated the agreement as evidenced by his testimony that he did not consider it binding until Mack agreed to indemnify the Klaymans for demolition costs. Respondent also argues that paragraph 13 was a part of the original agreement when it was executed on November 4, 1964. Paragraph 13 of the agreement, set forth in our Findings of Fact above, covers the agreement between Mack and Isadore Klayman and Herman Klayman regarding sharing *105 the cost of demolition of some of the buildings.Respondent argues that because paragraph 13 was part of the original agreement, it shows conclusively that the Partnership had the intent to demolish the buildings when the agreement was executed on November 4, 1964. Obviously, respondent cannot prevail on both grounds. At trial when the original agreement was received in evidence it was apparent to the Court that paragraph 13 consisted of a different style of type than that used in the other portions of the contract. The Court has very carefully reexamined the original of the agreement of November 4, 1964. It is readily apparent that paragraph 13 17 and an insertion in paragraph 12(a) relating to zoning were typed on a different typewriter than other portions of the agreement on the same page and on the other pages. It appears that paragraph 13 and the paragraph 12(a) insertion are typed with an inked ribbon and all other portions of the agreement are typed with a carbon ribbon. The style of type is obviously different, the dollar symbols being the most noticeable difference. Having concluded that a different typewriter was used to type portions of paragraph 12(a) and *106 paragraph 13 than was used to type the remaining provisions of the agreement and noting that the insertion in paragraph 12(a) is an exception to the zoning classification printed on the form, we conclude that such portions were not typed concurrently with the other portions of the agreement. Herman Klayman's testimony was that paragraph 13 was added to the agreement around the middle of November after he determined with the advice of his architect that the buildings should be demolished. Not only do we believe his testimony, we also hold that such testimony is corroborated by the condition of paragraph 13 of the agreement. The inability of Mr. Silvers, attorney for the Klaymans, to recall the time of insertion of paragraph 13 causes 18 us little concern. At trial he was asked to recall events which occurred seven years previously. It is not unusual for an attorney to be unable to recall the dates of preparation or other details of legal documents after the lapse of such a long period of time. An attorney would probably not attach any significance to amending an agreement if both parties agree to it. The parties may, in fact, have amended the agreement without Mr. Silvers' *107 knowledge. Having found that the parties amended the agreement of November 4, 1964 by adding paragraph 13 we now consider respondent's argument that Herman Klayman repudiated the agreement. There is no evidence that Herman Klayman advised Mack that he would not abide by the terms of the agreement before paragraph 13 was added. He may have felt that the agreement was not binding until paragraph 13 was added but unless he communicated such feelings to the other party to the agreement (Mack) it could not constitute a repudiation nor could it give rise to an action by Mack for anticipatory breach until Mack could anticipate that Klayman would breach the terms of the agreement. There is no evidence that Isadore Klayman in any way repudiated the agreement or at any time 19 intended to breach any of its terms. We fail to see any evidence of repudiation of the agreement. Respondent argues that Stern, supra, requires a showing that the parties intended that the purchase be consummated when the purchase agreement was executed and for that date to be the effective date of acquisition. In Stern, supra, we stated at page 841 of 14 B.T.A.: It is clearly *108 indicated that the parties considered the actual purchase as consummated at the time the initial payment was made. We do not interpret this to be a requirement but rather a comment on the evidence in that case. Moreover, in the instant case, until Herman Klayman received the architect's report of the renovation costs, we believe that the parties to the agreement considered the actual purchase as consummated. The test to be applied is whether equitable title passed when the parties executed the agreement. First Nat. Bank & Trust Co. of Chickasha v. United States, supra, citing for its authority, Almac's, Inc., T.C. Memo 1961-13. Respondent has neither pointed to any facts nor cited any cases to persuade us that equitable title did not pass to the partners on November 4, 1964. 20 We find nothing in the record to indicate that the agreement of November 4, 1964, as amended in paragraph 12(a) and as amended by the addition of paragraph 13 was not fully performed by both parties. The remaining argument of respondent rests upon a scrap of paper from the files of PIDC dated November 8, 1964, which is set forth in full in our Findings of Fact above. *109 Respondent stresses the importance of the paper which we admitted in evidence under the "business records" exception to the hearsay rule. An employee of PIDC produced the file of PIDC which contained the paper and he identified it as part of the file. The witness did not know who prepared it nor did anyone testify who could explain any of the circumstances of its preparation. The date it bore, November 8, 1964, was a Sunday. Responent argus that it shows the Klaymans intended to demolish the buildings on November 4, 1964 and because counsel for petitioners strenuously objected to its admission in evidence, that somehow proves it to be damaging to petitioners, citing Heebner v. Commissioner, 280 F.2d 228 (C.A. 3, 1960), affirming 32 T.C. 1162 (1959), certiorari denied 364 U.S. 921 (1960). 21 The Court of Appeals in Heebner, supra, held that a memorandum of a conversation with petitioner was admissible not only as a business record from which the memorandum was taken but that it was also admissible as an admission against interest of petitioner and a statement of understanding by the hearer of the conversation with petitioner. *110 The memorandum was as follows: This case is subject to this additional tax, which amounts to $6,500, and the seller, George K. Heebner, has asked us if we will assume at least one-half the share of the cost.
We feel that we should accede to Mr. Heebner's request in view of the fact that this deal was primarily negotiated on our behalf with George K. Heebner, the builder and technically was considered as the seller. In reality Mr. Heebner considers he is building the property for us, which is to be occupied by Nash and that he is, in fact, only the temporary owner. [P. 234 of 280 F.2d.] The memorandum in Heebner, supra, is obviously an admission against interest because it recites what Mr. Heebner said. The scrap of paper involved here doesn't indicate that anyone said anything to anyone else. It is admissible solely as a business record and not as an admission. 22 Counsel for petitioners understandably objected to its admission. Admissibility and weight of the evidence are separate concepts. The scrap of paper is admissible standing alone because it was shown to have come from the business records of PIDC, but it is entitled to no weight because *111 it tends to prove nothing without explanations by its preparer. We, accordingly, disregard it as evidence of intent to demolish on November 4, 1964. After carefully considering the entire record we conclude that petitioners did not contemplate demolition at the time of acquisition but instead fully intended to renovate the existing structures and only resorted to demolition after their architect apprised them of the estimated costs. Under these circumstances, the entire demolition loss is deductibe because the intent to demolish was formed after the Partnership acquired the property. Decisions will be entered for the petitioners in docket Nos. 4595-69 and 4596-69. Footnotes
1. Petitioners Herman and Shirley Klayman, docket No. 4595-69, utilized a portion of the demolition loss in 1965 as a net operating loss deduction carried back to 1962. ↩
2. The site before renovation consisted of approximately 30 different buildings. ↩
3. Sec. 1.165-3(a) (1). Intent to demolish formed at time of purchase. Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a)↩ on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of sec. 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. 4. Sec. 1.165-3(b) (1). Intent to demolish formed subsequent to the time of acquisition. Except as provided in subparagraph (2) of this paragraph, the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. See paragraph (c) of sec. 1.165-1 relating to amount deductible under section 165↩. The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished. 5. Sec. 1.165-3(c). Evidence of intention. (2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of muncipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by muncipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property. [Reg. sec. 1.165-3.] [T.D. 6445↩, 1-15-60.] 6. Sec. 1.165-3(c) (1)↩. Evidence of intention. Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom.