JOHN L. BEAR, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EDNA A. BEAR, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bear v. Commissioner
Docket No. 7698-77, 7722-77.
United States Tax Court
T.C. Memo 1979-304; 1979 Tax Ct. Memo LEXIS 222; 38 T.C.M. (CCH) 1182; T.C.M. (RIA) 79304; August 9, 1979, Filed *222 Before liquidating Brookridge adopted a plan of complete liquidation under sec. 337, I.R.C. 1954. Brookridge's primary assets consisted of an inventory of real property divided into lots. In preparing to liquidate, Brookridge entered into a real estate sales contract with a third party whereby Brookridge, and its assignees, promised to sell its entire remaining inventory to an independent third party purchaser, over what could be 2 years. Held: sale of inventory assets failed to qualify under sec. 337. Held further:Brookridge's liquidation failed to qualify under sec. 337 since contract to sell does not constitute a distribution of property subject to said contract. Thomas F. McIntyre and Richard F. McDivitt, for the petitioners. John Wendell Paul, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge:*
By letters dated April 21, 1977 respondent claimed deficiencies in income taxes against petitioners Edna A. Bear and John L. Bear, jointly and severally, in their capacities as transferees of *223 Brookridge Development Co., Inc. (Brookridge), a liquidated Kansas corporation. The claimed deficiency amounts are $923.66 for Brookridge's taxable year ended December 31, 1970 and $70,361 for Brookridge's short taxable period January 1, 1973 to October 31, 1973. After concessions, the only issue for our decision is whether or not Brookridge was entitled to the benefit of section 337, I.R.C. 1954, upon its liquidation. [1] *224 The claimed deficiency for Brookridge's taxable year ended December 31, 1970 is the result of respondent's disallowance of a claimed net operating loss carryback to Brookridge's taxable year 1970 from its last taxable period. Our determination of the section 337 issue shall, therefore, automatically affect respondent's claim for Brookridge's 1970 taxable year. FINDINGS OF FACT The cases before us were consolidated for purposes of trial, briefing, and opinion by joint motion of the parties granted by the Court on October 2, 1978. The facts were fully stipulated and are so found. The stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioners, John L. and Edna A. Bear, husband and wife, resided in Shawnee Mission, Kansas at the time their petitions herein were filed. At all times relevant hereto Brookridge, a Kansas corporation, also had an address in Shawnee Mission, Kansas. During the taxable periods in issue each petitioner owned personally 39.5 percent of the stock of Brookridge. Brookridge filed a United States corporate income tax return, on an accrual basis of accounting, for its short taxable period ended October 31, 1973 with the Austin Service Center, Austin, Texas. On January 14, 1974 Brookridge filed an application for tentative refund stemming from the carryback of a net operating loss from its October 31, 1973 return to its *225 1970 taxable year return. This application was accepted on May 25, 1974. Sometime prior to its liquidation Brookridge purchased and subdivided for resale a tract of land in Overland Park, Kansas. Brookridge subdivided this parcel into 120 lots. The development was called Brookridge Estates. On October 13, 1972 Brookridge adopted a plan of complete liquidation and dissolution under section 337. At that time 38 of the original 120 subdivided lots in Brookridge Estates remained unsold. On October 16, 1972 Brookridge entered into a contract with Pacesetter Homes Company (Pacesetter), an unrelated third party, with respect to these 38 lots. The relevant portions of this contract are set forth below: The Seller [Brookridge] hereby agrees to sell and the Buyer [Pacesetter] hereby agrees to purchase, upon the terms and conditions provided for herein, certain lots in the Brookridge Estates Subdivision, * * * for the sum of Three Hundred Seventy Thousand Nine Hundred Twenty-five Dollars ($370,925.00), which the Buyer agrees to pay as follows: Ten Thousand Dollars ($10,000.00) at the signing of this contract, the receipt of which is hereby acknowledged by the Seller as part of the consideration *226 of the sale and shall apply to the purchase of the first ten (10) lots, along with a non-interest bearing note in the amount of Twenty Thousand Dollars ($20,000.00), which shall apply to the purchase of the last three (3) lots, which shall be no later than October 15, 1974. The purchase of the first ten (10) lots shall be completed on or before ninety (90) days from the date of this contract. Five (5) additional lots shall be paid for no later than nine (9) months from the date of the signing of this contract, and five (5) additional lots shall be paid for at intervals not to exceed ninety (90) days thereafter. Delivery of the deed of any of the lots prior to the above described schedule, shall require payment in full for said lot at the time of delivery of the deed. Buyer shall select the lost it wishes to purchase as it progresses with the project. Prior to the closing of this entire transaction, if any extension of time for closing is requested by the Buyer and granted by the Seller, Buyer agrees to pay the Seller 7% interest on any money that might be due and payable and the tax pro-ration for the lots delivered after said extension of time shall be based on the original scheduled *227 date of closing for said lots. The Seller shall pay all installments of special assessments and general taxes for the year 1973 and all prior years. Special assessment installments and general taxes for the current calendar year during which any lot is deeded shall be prorated between the Buyer and the Seller as of the date of the delivery of the deed and shall be computed on the amount of the annual installment of special assessments and general taxes for the previous year. * * * The Seller shall furnish abstracts for each lot sold. In the event the Buyer wishes to have the abstract delivered prior to the delivery of the deed for said lot, it shall notify the Seller fifteen (15) days prior to the closing date of said lot. * * * The buyer shall have ten (10) days after such delivery of the abstract to examine it. If there are objections to the title, the buyer shall specify the objections in writing to the Seller. The Seller shall have any defects in the title corrected and shown on the abstract within thirty (30) days from the date of delivery of such objections. In lieu of correcting such objections, the Seller may furnish the Buyer with an Owner's Indemnity Title Insurance *228 Policy in the amount of the purchase price from the St. Paul Title Company of Kansas, Inc., who is authorized to insure titles in this state, insuring a merchantable fee simple title in the buyer as of the date of recording the deed. Seller shall have thirty (30) days from the date the Buyer has specified the objections in writing, to deliver said policy. * * * In the event this contract is not lived up to, then at the option of the Seller, any money paid in cash and on deposit with the Seller shall be forfeited and the Twenty Thousand Dollar ($20,000.00) note shall immediately become due and payable. Between October 16, 1972 and October 1, 1973 legal title to 22 of the remaining 38 lots in Brookridge Estates was transferred under the terms of this contract. [2] On October 1, 1973 Brookridge deeded the remaining 16 lots to petitioners operating as Bear & Bear Associates (a partnership) in a liquidating distribution. These lots were valued at contract price, i.e. the price stated in the contract between Brookridge and Pacesetter, and were ultimately deeded by petitioners to Pacesetter or Pacesetter's assignees under the terms of the real estate contract. The lots received by petitioners *229 from Brookridge, their fair market values (i.e. contract price), and dates deeded to Pacesetter or Pacesetter's assignee are set out below: Block
Fair Market
No.
Lot No.
Value
Date Deeded
1
22
$10,000
9-06-74
1
23
9,500
9-06-74
1
24
10,000
4-12-74
1
25
10,000
2-04-74
1
29
10,000
4-12-74 1
30
9,000
9-06-74
2
14
9,000
2-27-74
3
15
7,400
9-06-74
5
17
9,000
9-06-74
6
1
8,200
1-15-74
6
12
8,600
12-13-73
8
1
10,000
4-74 (date unavailable)
8
23
10,300
7-24-74
9
1
14,000
9-06-74
10
14
10,375
2-04-74
11
16
8,500
1-15-74
Upon conveyance of legal title to the last of the 16 lots held by Bear & Bear Associates, i.e. sometime on or about September *230 6, 1974, the $20,000 note referred to in the real estate contract was returned to Pacesetter. OPINION The only issue for our decision is whether or not the above quoted contract worked a sale or exchange of substantially all of Brookridge's inventory property to one person in one transaction within 12 months of the date of adoption of Brookridge's section 337 plan of liquidation, within the meaning of section 337(b)(2)[3] *231 and the relevant regulations. [4] *232 Respondent argues that petitioners must fail herein because their transferor, Brookridge, did not convey its inventory property to Pacesetter in a bulk sale constituting "one transaction." He argues, rather, that the real estate contract called for the seriatim purchase by Pacesetter of Brookridge's lots and that, therefore, the transaction was not a "closed" one for tax purposes within the required 12 months after October 13, 1972. Petitioners argue that, while the language of the real estate contract is "ambiguous and inartistic", its form should not be allowed to prevail over its substance. The substance of the transaction, argue petitioners, is that the real estate contract constituted a bulk sale by Brookridge of substantially all its inventory assets to Pacesetter in a closed transaction within the *233 meaning of section 337(b)(2) because (1) equitable title to all 38 lots passed to Pacesetter on October 16, 1972 when the real estate contract was signed, and (2) possession of all 38 lots shifted to Pacesetter at that same time. We hold for respondent. The question of when a sale or exchange is complete is one of fact to be resolved from a consideration of all the surrounding facts and circumstances of the sale. Baird v. Commissioner,68 T.C. 115, 124 (1977), Harmston v. Commissioner,61 T.C. 216, 228 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976). No hard and fast rules of thumb exist and no single factor is controlling. TennesseeNatural Gas Lines v. Commissioner,71 T.C. 74, 83 (1978). Among the factors to be considered in determining whether a sale or exchange is complete is the transfer of legal title and the shift of the benefits and burdens of ownership. Merrill v. Commissioner,40 T.C. 66, 76 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). When these factors do not occur simultaneously, the courts appear to place special emphasis on the one that occurs first. Dettmers v. Commissioner,430 F.2d 1019, 1023 (6th Cir. 1970), affg. sub nom. Estate of Johnston v. Commissioner,51 T.C. 290 (1968). *234 We cannot accept petitioners' thesis that the October 16, 1972 contract was a "contract for deed", causing equitable title to pass to the vendee and thereby satisfying the section 337 requirement that the corporate inventory be sold eithin 12 months from the date of adoption of a plan of liquidation to one purchaser. Nor can we reach the result desired by petitioners by characterizing the contract as "ambiguous and inartistic". This is not a case involving meaningless boiler plate language. Cf. Martinez v. Commissioner,67 T.C. 60, 71 (1976). Rather we find inescapable the conclusion that the contract itself clearly contemplated the possibility that title to some 18 of the 38 lots would not be delivered until sometime during the second year following the date of its execution. In fact the parties have stipulated that legal title to only 22 of the 38 lots had been transferred by October 1, 1973. The contract is clear in providing that legal title to the various lots would be held by Brookridge or its assignees until each lot was "purchased". Delivery of any lot's deed, and hence its legal title, was not required until payment in full therefor had been made. Thus Brookridge at *235 no time parted with anything for which it had not been paid, and was not required by the contract to do so. For this reason we conclude that there was no security element in the contract. Certainly the most important indicium of ownership, passage of title, occurred only seriatim over the course of two years after the real estate contract was executed. That the transfer of title in this case was not simply a substanceless charade is indicated by the important conditions precedent to the transfer. For example, prior to purchasing a lot the buyer could require that an abstract of title therefor be provided by the seller. If title was considered not merchantable, the buyer could require one of two alternative cures of the defect. Further, the buyer had to select the particular lot he wished. The second indicium of when a completed sale or exchange had occurred, i.e. the shift in the benefits and burdens of ownership, also appears to have occurred only as each lot was "purchased". Special assessment installments and general taxes were, for example, prorated between the buyer and seller as of the date any deed was, or was required to be, delivered. Further, interest on the purchase *236 price did not accrue until the original due date for delivery of title to any particular lot had passed. Thus we conclude that in substance, as well as form, the real estate contract called for the seriatim sale and transfer of the various lots covered thereby over the course of approximately two years. As the real estate contract contemplated a series of sales, not one sale in one transaction, Brookridge's liquidation failed to qualify under section 337(b)(2). Alternatively, the same conclusion may be expressed in terms of a "closed transaction" theory: if we were to conclude that these many transfers were made pursuant to one sale transaction, we would then be forced to conclude that this sale transaction was not closed within the required 12-month period and that, therefore, the transaction before us still fails to qualify under section 337. The case before us is similar to our case in Number Nine Plantation v. Commissioner,23 B.T.A. 974 (1931). That case also involved a real estate sales contract. We concluded that the contract was executory and was, hence, a mere contract to sell and that the transaction was, therefore, not closed. In reaching this conclusion we relied upon *237 such facts as (1) the contract to sell indicated upon its face that the actual land sale and conveyance was to be made in the future, (2) taxes and insurance were prorated to the date the deed was delivered, and (3) no payments were due until an abstract of title had been furnished. For these reasons we concluded that the obligations created by the contract were not unconditional. [5]
*238 In place of the objective "facts and circumstances" test applied above for determining whether a sale or exchange has taken place, and if so, its date, petitioners would have us adopt a new test. Petitioners propose we adopt the test of "whether equitable title passed when the parties executed the agreement." Apparently petitioners would have us consider the view of each jurisdiction with respect to when equitable title passes in a real estate sale situation and hold this date to be the date of the land's "sale or exchange." The obvious answer to this is that the concept of equitable title is a device for doing equity during that period of time before the actual legal sale or exchange of a property occurs. While a finding that equitable title has passed may indicate the imminence of a taxable sale or exchange, we do not believe the two to be synonymous. The cases relied on by petitioner are inapposite.Petitioner cites, for example, First Nat. Bank & Trust Co. of Chickasha v. United States,462 F.2d 908 (10th Cir. 1972), Klayman v. Commissioner,T.C. Memo 1973-200 (32 T.C.M. 930, 1973 P-H Memo T.C. par. 73,200), and Almac's Inc. v. Commissioner,T.C. Memo 1961-13 (20 T.C.M. 56, 1961 *239 P-H Memo T.C. par. 61,013), for the proposition just rejected, i.e. that equitable title is relevant to whether or not a "purchase" has occurred. All these cases involved the question of whether or not the taxpayers therein had "purchased [real property] with the intention of demolishing * * * the buildings situated thereon" within the meaning of section 1.165-3, Income Tax Regs.--not whether or not a sale within the meaning of section 337(b)(2) had occurred. The intent at the time of initial commitment was the determinative fact in those cases. In contrast to the real estate contract before us, the case of Ditzen v. Given,32 P.2d 448 (1934), cited by petitioner, involved a contract which the Kansas Supreme Court referred to as an "option to purchase", and which that court found to be a mortgage. Further, the "option to purchase" in Ditzen v. Given,supra, explicitly transferred possession and explicitly shifted the benefits and burdens of ownership to the option holder. [6] *240 The case of Wiseman v. Scruggs,281 F.2d 900 (10th Cir. 1960), also cited by petitioners, involved a factual situation, in contrast to the one before us, in which a fixed interest rate was applied to the balance owing on the purchase price starting approximately 1 month after the sales date, the contract clearly entitled the purchaser to possession, and taxes were prorated as of the sale date. Further, the court in Wiseman v. Scruggs,supra, expressly found that the contract before it was not an executory contract to sell. Wiseman v. Scruggs,supra at 902. Finally while Jeanese, Inc. v. United States,227 F.Supp. 304 (D.C. N.D. CA. 1964), revd. and remanded 341 F.2d 502 (9th Cir. 1965), involved a deposit *241 receipt similar to the real estate contract before us, the Ninth Circuit's opinion focused on the "retained to meet claims" requirement of section 337(a)(2)--not the "one transaction" requirement of section 337(b)(2). We can sympathize with the petitioners for the transaction at issue could have been structured more artfully. Nonetheless we are without authority to decide the case on what might have been. Decisions will be entered for Respondent.
Footnotes
*. By Order of the Chief Judge dated June 20, 1979, these cases were reassigned from Judge Bruce M. Forrester to Judge Samuel B. Sterrett↩ for disposition.
1. Petitioners have conceded that, in the event we determine deficiencies in Brookridge's income taxes for its taxable year ended December 31, 1970 and for its short taxable period ended October 31, 1973, they are jointly and severally liable for the payment of such deficiencies plus interest, as transferees of Brookridge within the meaning of sec. 6901. They have also conceded that Brookridge was a member of a controlled group of corporations and that, therefore, its tax for its short taxable year period ended October 31, 1973 must be computed under sec. 1562.
2. The parties stipulated that "legal titles to 22 of the lots in Brookridge Estates were transferred [between October 16, 1972 and October 1, 1973], as detailed in Exhibit A of the statutory notice * * *". Our inspection of Exhibit A shows that although one lot was "billed" to Pacesetter on October 1, 1973, legal title thereto was not transferred, and payment therefore was not made, until October 25, 1973. Thus while we shall, for convenience, use the numbers as stipulated, we note that titles to only 21 lots were transferred from Brookridge to Pacesetter prior to Brookridge's liquidating distribution on October 1, 1973.↩
3. SEC 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule.--If-- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. (b) Property Defined.-- (1) In General.--For purposes of subsection (a), the term "property" does not include-- (A) stock in trade of the corporation, or other property of a kind which would propertly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, * * *
(2) Nonrecognition with Respect to Inventory in Certain Cases.--Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes-- (A) such property so sold or exchanged * * *.↩
4. Sec. 1.337-2. Sales or exchanges within the scope of section 337.
(a) * * * The date on which a sale occurs depends primarily upon the intent of the parties to be gathered from the terms of the contract and the surrounding circumstances. * * *. Moreover, an executory contract to sell is to be distinguished from a contract of sale. Ordinarily, a sale has not occurred when a contract to sell has been entered into but title and possession of the property have not been transferred and the obligation of the seller to sell or the buyer to buy is conditional.
(b) * * * Section 337↩ shall not apply in any case in which all of the corporate assets (other than those retained to meet claims) are not distributed to the shareholders within 12 months after the date of the adoption of the resolution by the shareholders authorizing the distribution of all the corporate assets in redemption of all the corporate stock.
5. Our holding in Number Nine Plantation v. Commissioner,23 B.T.A. 974 (1931), is also relevant to another tangential argument made by petitioner. As some evidence that Pacesetter had possession of the land, petitioners offer a sales contract whereby Pacesetter sold certain lots to a buyer before it had received title to the lots from petitioners (as transferees of Brookridge). When presented with a similar argument in Number Nine Plantation v. Commissioner,supra, we observed that at "the time * * * [petitioner] entered into this contract to sell to others * * * [petitioner] was in no position to comply therewith unless * * * [petitioner's] own contract had been complied with. This does not indicate that the vendee had actual possession or exercised any rights of ownership." Number Nine Plantation v. Commissioner,supra↩ at 978.
6. Petitioners argue that possession by Pacesetter was shown by way of a claim in their petition that Pacesetter occupied 2 of the 38 lots after the sales contract was executed. From the fact that, in his answer, respondent claimed a lack of sufficient information or knowledge to admit or deny this allegation, petitioners would conclude that their claim in this regard is established as a fact for purposes of this case. Clearly, we can draw no such inference from the pleadings in this case. Rather it was incumbent upon petitioners to carry their burden of proving this alleged fact. Welch v. Helvering,290 U.S. 111↩ (1933). Petitioners could not merely rely on their petition in this regard.