644

## AFTER THE REORGANIZATION

ELECTRIC ENERGY, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 574–85T.

United States Claims Court.

Oct. 27, 1987.

Sharon L. King, Chicago, Ill., for plaintiff. Pamela B. Strobel and Michael R. Goldfein, Isham, Lincoln & Beale, of counsel.

David Gustafson, Washington, D.C., with whom were George L. Hastings, Jr., and Acting Asst. Atty. Gen. William S. Rose, Jr., for defendant. Theodore D. Peyser, of counsel.

## OPINION

NETTESHEIM, Judge.

This case comes before the court after argument on two cross-motions for partial summary judgment addressing three issues and after trial of the fourth issue. The facts and law are set forth separately for each of the four major issues. Facts material to the first three issues on summary judgment are undisputed, unless otherwise indicated.

## BACKGROUND

Electric Energy, Inc. ("plaintiff"), is incorporated in the State of Illinois with its principal office and place of business in Joppa, Illinois. In 1950 plaintiff was organized by five utility companies (the "sponsoring companies"). For the years involved in this case, ownership had been reduced to four companies: Union Electric Company (40 percent); Illinois Power Company (20 percent); Central Illinois Public Service Company (20 percent); and Kentucky Utilities Company (20 percent).

Plaintiff was formed to provide power to the Paducah installation (the "Paducah Project"), a gaseous diffusion plant, of the Atomic Energy Commission. The Department of Energy ("DOE"), as the successor to the Atomic Energy Commission, will be referred to as the cognizant federal agency, the name of which changed during the period of plaintiff's dealings with DOE.[1]

1. The Atomic Energy Commission and the Ener-    gy Research and Development Administration

The Paducah Project is one of three uranium enrichment facilities that were constructed in the early 1950's to meet the nation's need for enriched uranium for use in tactical weapons. Toward that end plaintiff constructed and operated the Joppa Generating Plant (the "Joppa Plant") in Joppa, Illinois. This electric generating station was to provide, for an initial 25-year period, a substantial portion of the then–contemplated power requirements of the Paducah Project.

Plaintiff originally sought recovery of $10,352,074 in federal income tax, plus interest, paid for the years 1975–1982, exclusive of 1976. Deficiencies were assessed and paid following audits by the Internal Revenue Service (the "IRS") because plaintiff had not included in its gross income certain surcharge payments made by DOE, as well as amounts received by plaintiff from DOE and the sponsoring companies for the replacement of property. The IRS also challenged plaintiff's depreciation of additions to the Joppa Plant and expensing the costs of repairing six economizers, rather than capitalizing them. Only the repairs issue was tried. The parties have settled two other claims concerning repair costs that the IRS had contended should have been capitalized.

By way of context, three of the disputes between plaintiff and the IRS derive from the IRS' disapproval of agreements between plaintiff and DOE to afford DOE power at the lowest cost by enhancing plaintiff's yield through matching income and deductions. These agreements obligated DOE to pay rates or to make reimbursements dependent on the tax treatment of contributions to capital, depreciation of facilities, and deduction of expenses for repairs. Since DOE's objections to the IRS' adjustments leading to plaintiff's suit are a matter of record before this court, plaintiff and the court commended to defendant

Exec. Order No. 12,146, 3 C.F.R. 409 (1979), which encourages resolution of all disputes between executive agencies by the Attorney General. Defendant took the position that the Attorney General acted on any differences between the DOE and the IRS in respect of plaintiff by authorizing the Tax Division to defend against plaintiff's claims. That this case could have been resolved by a dispute resolution mechanism within the Executive Branch, however, does not affect the court's decisions. Since the claims were presented for judicial disposition, they have been accorded full dignity, and no account has been taken of the fact that the public monies will flow to plaintiff even if it loses here.

## I. *Surcharge*
### FACTS

To finance the Joppa Plant, plaintiff sold 25-year bonds to two insurance companies which were to provide 100 percent of the costs of construction. Plaintiff was to make level payments to a 25-year sinking fund for repayment of the bonds and interest thereon. On May 4, 1951, plaintiff entered into a 25-year power contract with DOE that would have met substantially all of the 25-year sinking-fund mortgage debt. Additionally, plaintiff obtained from the sponsoring companies an agreement dated May 14, 1951, and August 1, 1953—the Interim Supplemental and Surplus Power Agreement (the "IS & S")—to furnish the balance of the funds needed to meet the sinking-fund debt payments.

The contract between plaintiff and DOE was modified five times between 1951 and 1953; however, none of these modifications has any bearing on plaintiff's claims. On July 23, 1953, the parties executed Modification No. 6, which amended and restated the contract. This modification became the basic document under which the parties operated. It provided that plaintiff was

were predecessors to DOE. The Atomic Energy Commission was abolished, and most functions of the Commission were vested in the Nuclear Regulatory Commission and the Administrator of the Energy Research and Development Administration. *See* Energy Reorganization Act of 1974, Pub.L. 93–438, 88 Stat. 1233 (1974). The

duties of the Energy Research and Development Administration and its officers were vested in the Secretary of Energy, unless otherwise specifically provided, as part of the creation of DOE. *See* Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (1977).

obligated to provide DOE with 735,000 kilowatts ("kw") of electric power on a firm basis and also changed the contract expiration date to 25 years from the date of its execution. Additionally, under section 6.03 of Modification No. 6, DOE had the right, totally or in part, to cancel the contract upon the furnishing of notice and the payment of certain cancellation charges.

During the early 1960's, the power requirements for the Paducah Project were greatly reduced, and DOE sought to reduce the amount of power that it purchased from plaintiff. Plaintiff agreed to this reduction, and, on April 17, 1964, the parties executed Modification No. 9. This modification amended section 6.03 of Modification No. 6 in that DOE could cancel the purchase of up to 500,000 kw of power without the payment of a cancellation charge. On July 1, 1964, DOE elected to cancel 175,000 kw and on June 16, 1966, cancelled the remaining 325,000 kw.

Pursuant to the IS & S agreement, the cancelled capacity was required to be taken and paid for by the sponsoring companies according to their respective ownership interests. This mandatory purchase resulted in substantial costs to each sponsoring company. DOE's cancellation also delayed plaintiff's construction plans and resulted in financing costs that would have otherwise been borne by DOE. By early 1968 DOE decided that it needed the power it had cancelled under Modification No. 9. Accordingly, the parties entered into Modification No. 10 on February 7, 1968. This modification restored DOE's 500,000-kw option cancelled in 1964 and 1966. Modification No. 10 also contained section 3.05–A(iii), requiring DOE to reimburse the sponsoring companies for any costs incurred as a result of permitting DOE to cancel and restore the 500,000 kw:

> Section 3.05–A. *Extension of Term with Respect to Power Furnished Under Article II–A.* The provisions of Sections 3.11 and 6.02 relating to service after the initial contract term provided for in Section 6.01, ending July 23, 1978, shall have no application to the capacity and energy restored pursuant to Article II–A. As to such capacity and energy, AEC is hereby given the option to extend Contract No. AT–(40–1)–1312, as heretofore amended and as amended by this Modification No. 10, for a period of ten years beyond December 31, 1979, the end of the term provided for in Section 6.01–A, by giving to the Company five years' prior written notice of such extension; *provided, however,* that such extension shall be subject to negotiation of new provisions giving consideration and effect to
>
> . . . .
>
> (iii) the inclusion in the rate to be paid by AEC of an amount representing a return on the Company's equity, a recognition of probable costs to be incurred for demolition of the then obsolete Joppa plant upon or shortly after expiration of the extended term, and a partial reimbursement, through their agreements with or investments in the Company, to the Sponsoring Companies for costs incurred as the result of permitting the cancellation pursuant to Modification No. 9 and the restoration pursuant to this Modification No. 10 of 500,000 kw in a manner not theretofore contemplated by Contract No. AT–(40–1)–1312; . . .

Modification No. 10 also carried an expiration date of December 31, 1979.

In 1972, when DOE sought to exercise the contract extension clause, negotiations began regarding the payment that DOE would be required to make to the sponsoring companies pursuant to section 3.05–A(iii) of Modification No. 10.[2] The sponsoring companies claimed approximately $30 million in damages with a future worth of $80 million by 1980. After lengthy negotiations, the parties agreed to the sum of $42 million, which had a 1980 present value of $26 million, in the form of a surcharge to be paid by DOE regardless of whether it took the power or not. This agreement was set forth in Modification No. 11, dated February 3, 1975. On the same day, plain-

---

**2.** In his deposition Charles B. White, an auditor for DOE, indicated that plaintiff's negotiating team was principally made up of representatives of the sponsoring companies, with only one member from plaintiff.

tiff and the sponsoring companies agreed to Amendment No. 5 to the IS & S. Both Modification No. 11 and Amendment No. 5 were filed with the Federal Power Commission (the "FPC") and the Illinois Commerce Commission. Article III of Modification No. 11, captioned "Rates" provided, in pertinent part:

Section 3.01. *Base Rate—Permanent Power.* The base rate for permanent power shall consist of:

(a) *Demand Charge*

....

(b) *Energy Charge*

....

(c) *Surcharge*

In consideration of Company's granting ERDA access to the 500 MW block of power during the term of this Agreement subsequent to December 31, 1979, ERDA shall pay a surcharge each month during the period beginning August 1, 1980, and extending through December 31, 1989, equivalent to the product of 735,000 kilowatts multiplied by 0.7 mills per kilowatt-hour multiplied by the number of hours in the month for which billing is taking place. Provision for the payment of this surcharge, together with the other terms and conditions included in Modification No. 11, *shall constitute full satisfaction of and compliance with the requirements of Section 3.05–A of Modification No. 10, including the partial reimbursement for costs incurred by the Sponsoring Companies as contemplated by Section 3.05–A(iii). Such surcharge shall be paid notwithstanding any other provision of this Agreement, including but not limited to Section 56.03 relative to ERDA's right of cancellation of this Agreement.*

(Emphasis added.)

By Amendment No. 5 to the IS & S Agreement, each sponsoring company had the right to purchase, in an amount equal to its percentage of stock ownership, surplus power from the Joppa Plant not taken by DOE under Modification No. 11. Each sponsoring company agreed to pay both a demand and supply charge for the power actually taken. Section 3.04 of Amendment No. 5 captioned "Demand Charge" provided that plaintiff would determine monthly the demand charge for each sponsoring company by taking into account the surcharge "to be billed to ... [DOE] for such month." The surcharge was factored in as a revenue item, and the demand charge ultimately was to reflect an amount equal to each sponsoring company's participation ratio. Thus, the demand charge to each sponsoring company was reduced by that portion of the surcharge paid by DOE equivalent to each sponsoring company's ownership interest.

An internal DOE memorandum of December 12, 1974, concluded that the surcharge was "an equitable and justified reimbursement for the costs incurred" as a result of the cancellation. In reaching this conclusion, DOE noted: "The additional payment could, of course, have been included as a component of the demand charge. EEI's negotiators proposed treating it as an energy surcharge and AEC's negotiators could see no real objection to that approach."

Questioning the surcharge before it went into effect, the FPC initiated an investigation. DOE met with the FPC and requested that the investigation be halted. Although DOE told the FPC that it viewed the surcharge "as part of the price ... [it] must pay to get the full 500–MW block of power," DOE took the position that the "surcharge was fully justified and supported both as to concept and amount." Memorandum of J.C. Winkles, Deputy Chief Counsel, DOE, Oak Ridge Operations (May 15, 1975). On October 23, 1975, plaintiff filed a motion to terminate the investigation, explaining the nature and background of the surcharge. The FPC terminated the investigation on December 10, 1975, without determining the reasons for the surcharge.

On August 1, 1980, plaintiff began billing DOE for the surcharge in equal monthly installments. This billing continued through 1982. DOE was billed the following amounts pursuant to section 3.01(c) of

Modification No. 11: 1980—$1,889,759; 1981—$4,507,020; and 1982—$4,507,020. These amounts simultaneously were credited to the sponsoring companies on the monthly invoices that they received from plaintiff.

It is this billing arrangement that defendant questions, arguing that the surcharge was part of the purchase price of the electricity paid to plaintiff by DOE. Thus, defendant contends that the surcharge was income to plaintiff and that, when plaintiff credited the sponsoring companies with a portion of the surcharge according to their respective ownership interests in calculating the demand charge, it was paying them a dividend. Plaintiff rejoins that the surcharge was a negotiated settlement that DOE agreed to pay to the sponsoring companies, that plaintiff only acted as a conduit in the transaction, and that plaintiff therefore should not be taxed on the surcharge.

## DISCUSSION

Section 61(a)(1) of the Internal Revenue Code, 26 U.S.C. § 61(a)(1) (1982) (the "I.R.C."), defines gross income as "all income from whatever source derived, including ... [c]ompensation for services, including fees, commissions, and similar items." However, two well-established common law doctrines, the claim of right and the trust fund doctrines, establish that gross income does not include amounts that are received by a taxpayer acting as a conduit for payment to another.

The Claim of right doctrine was established in *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932). "If a taxpayer receives earnings under a claim of right and without restrictions as to its disposition, he has received income...." and accordingly must be taxed on it. 286 U.S. at 424, 52 S.Ct. at 615. If the taxpayer is obligated to dispose of the money a certain way, accruing no benefit, the funds are considered to be excluded from the taxpayer's gross income. *See Central Life Assurance Soc'y v. Comm'r*, 51 F.2d 939 (8th Cir.1931) (since taxpayer obligated to dispose of money by

contract, money not income); *Bates Motor Transp. Lines, Inc. v. Comm'r*, 17 T.C. 151, 158 (1951) (excess amounts collected that taxpayer was obligated to refund to Government not gross income), *aff'd*, 200 F.2d 20 (7th Cir.1952).

The claim of right doctrine is inapplicable if there are no restrictions on the taxpayer's disposition of the funds. It is quite apparent that the surcharge was not at the unrestricted disposal of plaintiff. Section 3.01(c) of Modification No. 11 states that the surcharge "constitute[d] full satisfaction of and compliance with the requirements of section 3.05–A(iii) of Modification No. 10." The surcharge was to be used exclusively to reimburse the sponsoring companies for the costs they had incurred as a result of DOE's cancellation and restoration of power. Both plaintiff and DOE were fully cognizant of this arrangement. Plaintiff always has maintained that the reason for the surcharge was to effect reimbursement, and employees of DOE expressed the same view. Charles B. White, an auditor for DOE, agreed in his deposition to the statement that the surcharge involved in Modification No. 11 reflected costs that the sponsoring companies incurred. James Coleman Hall, a DOE attorney who supported Deputy Chief Counsel Winkles, DOE's lead negotiator for Modification No. 11, concurred with this explanation. Mr. Hall agreed to the statement that plaintiff did not receive any benefit from the surcharge. He then went on to confirm that 100 percent of the surcharge paid to plaintiff by DOE was passed on to the sponsoring companies.

This deposition testimony is pivotal to defendant's contention that a disputed issue of fact permeates the record respecting whether the surcharge was income to plaintiff. According to defendant, this issue devolves to ascertaining the motivation or reason that DOE paid the surcharge. Defendant points to some of the language quoted above from the December 12, 1974 and May 15, 1975 DOE memoranda, arguing that the evidence, at best, shows that the parties agreed to disagree on what the surcharge payments represented.

Defendant is correct that DOE needed the power, disputed plaintiff's claim, and agreed to the surcharge (which was part of the rate), because the rate, even including the surcharge, was reasonable. However, plaintiff is correct that DOE not only agreed to the surcharge, but supported its justification as a disposition of plaintiff's claims both internally in the December 12, 1974 memorandum and before the FPC per the May 15, 1975 memorandum.

Defendant then argues that DOE's lack of commitment to characterize the surcharge as damages detracts from its employees' recent deposition testimony. The undisputed fact that does not comport with defendant's argument, however, is that DOE ultimately justified the surcharge as payment for plaintiff's claims. That DOE availed itself of the felicitous option of describing the amount of the surcharge as a reasonable rate, as well as a reasonable payment of damages, does not change the nature of the surcharge or humble the testimony of the agency deponents. The statements of Messrs. White and Hall are party admissions under Fed.R.Evid. 801(d)(2), and defendant has not offered evidence to undermine these admissions or create an issue about their substance.

The "cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not throw the burden upon a mere collector or conduit through whom or which the income passes...." *Central Life*, 51 F.2d at 941 (citations omitted). The sponsoring companies were the beneficiaries of the surcharge. This is made clear by section 3.04(c) of Modification No. 11 and the deposition testimony of Messrs. White and Hall. Although plaintiff did receive the surcharge, it was obligated to credit the sponsoring companies the full amount of the surcharge. The claim of right doctrine does not apply because of the restriction put on the use of the surcharge.

Similar to restrictions on disposition is a taxpayer's receipt of the funds in a role of agent or trustee. In these situations the taxpayer is described as a mere conduit or collector through which the income passes.

This trust fund doctrine has two basic elements: 1) The taxpayer is obligated to expend the total amount for a specific purpose, and 2) the taxpayer must not derive any profit, gain, or receive any benefit from the money. *Seven–Up Co. v. Comm'r*, 14 T.C. 965, 979 (1950), *acq. in* 1950–2 C.B. 4, *withdrawn and acq. in* 1974–2 C.B. 4.

This case contains both of these elements. Amendment No. 5 to the IS & S obligated plaintiff to transfer the surcharge that it received from DOE to the sponsoring companies. Section 3.05–A(iii) of Modification No. 10 contemplated "a partial reimbursement through their agreements with or investments in ... [plaintiff], to the Sponsoring Companies" for the cancellation. Section 3.04(c) of Modification No. 11 implemented the commitment of Modification No. 10. The facts presented demonstrate that plaintiff's role in the transaction was that of a mere conduit.

There is no merit in defendant's contention that plaintiff benefitted from the surcharge. Defendant assumes that the surcharge was income to plaintiff. As the Tax Court determined in *Seven–Up*, however, if a taxpayer recovers money and is obligated to dispose of it to benefit another, no gain or profit can be realized on the receipt because of the offsetting obligation. 14 T.C. at 979. Thus, when plaintiff distributed the surcharge to the sponsoring companies, it was not distributing earnings profits in the form of a dividend, as defined in I.R.C. § 316.

Defendant looks to the credits going to the sponsoring companies, the pro rata character of the allocation, and the "bargain sale" of power to the sponsors. However, the evidence fails to support defendant's argument. The Court of Claims stated that "a payment to or for the benefit of a stockholder is not the only element of a dividend. A dividend also necessitates a distribution of corporate earnings and profits." *Citizens Bank & Trust Co. v. United States*, 217 Ct.Cl. 606, 612, 580 F.2d 442, 446 (1978) (citing I.R.C. § 316 (footnote omitted)). The surcharge could not have been a payment of dividends, because the

surcharge was never earnings or profit to plaintiff. All the evidence indicates that the surcharge was to go to the sponsoring companies for the damages that may have incurred as a result of DOE's cancellation. This intent was borne out by section 3.04(c) of Modification No. 11 and the deposition testimony of DOE's employees.

Defendant next points to the pro rata character of the allocation of the surcharge, urging that such a distribution is strong evidence that it was a dividend payment. The IS & S agreement required the sponsoring companies to take the energy that DOE had cancelled. This was accomplished through the sponsoring companies' participation ratio—their ownership. The sponsoring companies incurred substantial damages due to the required purchase, roughly proportionate to their sponsorship interest. That is why the surcharge was distributed in a pro rata fashion.

Defendant objects to plaintiff's relying on the Affidavit of George A. Rice, Jr., July 1, 1987 ¶ 5, to support this contention, arguing that it fails to meet the requirements of RUSCC 56(f). Mr. Rice is plaintiff's president and was also its chairman of the board. Specifically, defendant asserts that the statement was not made on personal knowledge and fails to show that affiant was competent to testify personally to matters stated therein. Since Mr. Rice was listed as a witness for trial, the court ordered during the pretrial conference that he be examined at trial as to the substance of his affidavit on this issue. Mr. Rice's testimony established that the board of directors appointed a committee to negotiate Modification No. 11. Plaintiff's vice president attended the negotiations and reported to Mr. Rice. Minutes of the meetings were circulated contemporaneously. Mr. Rice signed Amendment No. 5 to the IS & S on behalf of plaintiff. Since Mr. Rice testified as to information he received, as an officer of plaintiff in the regular course of his duties, the testimony was not offered to prove the truth of the matter asserted. However, a review of all the other evidence on this issue, especially Amendment No. 5 to the IS & S, proves the scenario testified to by Mr. Rice, and his testimony demonstrates a course of conduct consistent with it.

Defendant argues that the surcharge credits resulted in bargain sales to the sponsoring companies. Again, this argument is premised on the surcharge's being income to plaintiff. This case did not involve a sale of corporate assets for less than fair market value. In fact, it did not involve any corporate assets at all. It was suggested by DOE auditor White that the arrangement was for the sake of convenience, stating that it was easier to make one payment to plaintiff instead of four to each of the sponsoring companies. The sponsoring companies were not receiving "bargain sale" power; they were only having the surcharge due them credited to their purchases.

Recent court decisions cited by both parties tend to favor plaintiff. The Seventh Circuit's decision in *Illinois Power Co. v. Commissioner*, 792 F.2d 683 (7th Cir.1986), parallels this case. There the court held that a surcharge was not income to plaintiff, even though for a time plaintiff enjoyed unrestricted use of the funds, since the surcharge was ordered by the Illinois Commerce Commission to discourage consumption of natural gas. The purpose of the surcharge was to promote gas conservation, not benefit the utility. The utility had unrestricted use of the funds until the commission decided what to do with the surcharge. During this interim period, the utility commingled the surcharge with its own funds. The surcharge payments existed only as a series of bookkeeping entries. The Seventh Circuit held that the commission's order requiring plaintiff to hold the money until the agency decided what to do with the funds was a sufficient restriction as to disposition. In the instant case, plaintiff never had unrestricted use of the surcharge. When the surcharge was received from DOE, it was credited simultaneously to the sponsoring companies.

Additionally, plaintiff's position is supported by the Claims Court's recent decision in *Iowa Southern Utilities Co. v. United States*, 11 Cl.Ct. 868, 872–73 (1987), *appeal docketed*, No. 87–1339 (Fed.Cir.

May 7, 1987). Holding that a surcharge was includable in a taxpayer's gross income because the utility enjoyed unrestricted use of the surcharge, the court distinguished between a mere conduit of money and a recipient that exercises control over the funds for its own benefit. *Id.*

Finally, defendant contends that plaintiff is bound by the form of the transaction, citing *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974), for the propositions that "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred...." and that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not...." 417 U.S. at 148, 149, 94 S.Ct. at 2137 (citations omitted). First, defendant points out that the surcharge was structured as a component of the demand charge payable by the sponsoring companies. That is true. From this defendant argues that plaintiff is bound to the treatment of the surcharge as revenue. However, section 3.01(c) of Modification No. 10 obligates DOE to pay for the surcharge component of the rate whether or not it ever took power or cancelled its requirements. The surcharge may have been calculated in the demand charge, but the parties adopted a form of transaction inconsistent with characterization of the surcharge as payment for power purchased by DOE.

Second, defendant asserts that the parties stipulated that plaintiff included the payments as revenue on its books and that plaintiff's tax returns were prepared by reporting revenues exactly as shown on its books. The parties also stipulated that plaintiff simultaneously transferred the surcharge to the sponsoring companies by reducing revenues from the sponsoring companies by the amount of the surcharge, so that total revenues—hence, taxable income—did not include the surcharge. More precisely, Stipulation No. 69 recites, in pertinent part:

> DOE was billed for ... amounts [in 1980–1982] in equal monthly installments. Under Section 3.04 of the IS & S Agreement, such amounts were credited simultaneously on the monthly invoices to the Sponsoring Companies. On Plaintiff's books, revenues reflected the monthly billings to DOE (which included the Surcharge amount) and the monthly billings to the Sponsoring Companies (which showed a credit for the surcharge amount). Because the billings to DOE were increased by the Surcharge and the billings to the Sponsoring Companies were decreased by the Surcharge, the Surcharge had no effect on Plaintiff's total revenues and, accordingly, no effect on its book income. Plaintiff's federal income tax returns were prepared by reporting revenues exactly as shown on its books. On audit, the revenue agent increased Plaintiff's revenues by an amount equal to the Surcharge payments so that revenues for tax purposes exceeded book revenues, and then treated such additional income as dividend payments to the Sponsoring Companies.

In its full form, the stipulation explains plaintiff's accounting treatment of the surcharge, but does not support the proposition that the surcharge affected plaintiff's book income.

In determining the taxability of a transaction, substance, not form, controls. *Diedrich v. Comm'r*, 457 U.S. 191, 196, 102 S.Ct. 2414, 2418, 72 L.Ed.2d 777 (1982); *Mobil Oil Corp. v. United States*, 8 Cl.Ct. 555, 566 (1985). It is quite apparent that the surcharge was to benefit the sponsoring companies. Thus, in looking at the substance of this transaction, the surcharge should not be considered income to plaintiff.[3] Plaintiff prevails on its cross-motion on this ground.

---

**3.** The interested parties subsequently changed the method of payment. By an agreement known as the Six-Party Agreement, DOE was to pay the surcharge directly to the sponsoring companies instead of directly to plaintiff. Although plaintiff points to this arrangement to

## II. *Replacements*

### FACTS

The second issue on summary judgment is the taxability of funds that plaintiff received from DOE and the sponsoring companies for the cost of replacement units. These reimbursements were made pursuant to section 3.06 of Modification No. 11 and section 3.06 of Amendment No. 5 to the IS & S, which, respectively, obligated DOE to reimburse plaintiff for most of the cost of "any unit of property constituting a part of the Joppa Plant" and obligated the sponsoring companies to reimburse the remainder. As a result plaintiff received the following amounts from DOE and the sponsoring companies: 1977—$339,001.51; 1978—$59,830.32; 1979—$27,404.82; 1980—$80,896.39; 1981—$61,537.69; and 1982—$892,387.08.

Plaintiff did not at any time include the amounts received for replacement units as income. Upon an audit of plaintiff's tax returns, the IRS included the amounts as income and allowed depreciation and investment credit with respect thereto.

Plaintiff contends that the amounts received from DOE and the sponsoring companies were capital contributions under I.R.C. § 118(a), (b) and thus not includable as taxable income. Defendant's position is that the amounts were simply additional compensation received and earned by plaintiff for power supplied and sold to DOE and the sponsoring companies. The bulk of the funds received by plaintiff was attributable to a coal scraper in 1977 ($285,572.32) and combustion control equipment in 1982 ($748,696.97), although plaintiff also claimed as capital contributions, *inter alia*, amounts for replacements of portable vacuums, typewriters, drinking fountains, calculators, rubber expansion joints, batteries, automobiles, a pick-up truck, a tractor, and a portable radio. The IRS had allowed plaintiff for years before this dispute to treat replacements for such items as capital contributions, although defendant takes the position that they do not qualify even under the IRS' interpretation of capital contributions in effect before 1976.

support its argument, the agreement occurred

### DISCUSSION

■ I.R.C. § 118(a) provides that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." In support of the contention that the amounts received for replacement units fall under section 118(a), plaintiff cites *Liberty Light & Power Co. v. Commissioner*, 4 B.T.A. 155 (1926), along with other cases that follow its rationale. *See, e.g., Baltimore & Ohio Ry. v. Comm'r*, 30 B.T.A. 194 (1934), *pet. dismissed*, 79 F.2d 979 (4th Cir.1935); *Great Northern Ry. v. Comm'r*, 8 B.T.A. 225 (1927), *pet. dismissed*, 40 F.2d 372 (8th Cir.1930). In *Liberty Light* the Board of Tax Appeals held that amounts contributed by citizens of Indiana and Ohio for the construction of electric power lines did not constitute income to the taxpayer public utility to which they were transferred upon completion, since they did not represent payment for services rendered or to be rendered. However, the facts of the instant case are not similar to those underlying the *Liberty Light* line of cases, in which the IRS acquiesced until February 1, 1976, *see* Rev.Rul. 75–557, 1975–2 C.B. 33, *clarified in* Rev.Rul. 76–61, 1976–1 C.B. 12, on the basis of its interpretation that they "dealt with contributions by customers or prospective customers to public utilities in aid of construction of the utilities of [sic] extensions of service lines or of spur tracks or like facilities to provide service to the contributor." Rev.Rul. 58–555, 1958–2 C.B. 25.

According to Rev.Rul. 58–555, the distinction to be made is between "advance payments made for service" and payments made to regulated public utilities "for investment in facilities to be operated for an indefinite period for the benefit of the contributor." *Id.*, 1958–2 C.B. at 26. Rev.Rul. 58–555 is not a paradigm of clarity, since the IRS, on the one hand, interprets the *Liberty Light* line of cases as applying to construction of utilities or to extensions of service lines and then goes on to distin-

after the fact and is irrelevant.

guish a case because it did not involve payments for investment in facilities. There is no question, however, that *Liberty Light* involved construction, not investment in facilities that did not amount to construction or extension of facilities. In these circumstances the illumination of Rev.Rul. 58–555 cannot be decisive.

Plaintiff failed to avail itself on summary judgment of the opportunity to offer evidence that even the coal scraper and combustion control equipment could be classified as investments in service facilities. During trial on the repairs issue, the court denied as untimely plaintiff's motion to offer testimony on this issue. The pertinent exhibit already in evidence concerning the combustion control equipment ties the equipment to units 2, 5, and 6, which are plaintiff's facilities for producing electricity. The inference fairly to be drawn is that this equipment, whether or not part of each unit, aided in its operation. The same could be said of batteries or calculators, ostensibly used in the offices that managed the units. Almost all the replacement units claimed by plaintiff as capital contributions, even the drinking fountains, aided plaintiff's mission in operating facilities for an indefinite period for the benefit of the contributors. If Rev.Rul. 58–555 were given plaintiff's reading, the result would lead to the absurd. On this basis it is concluded that plaintiff's replacement units cannot be capitalized unless it is established as a matter of fact that they represent "a permanent part of ... [its] working capital structure." *United States v. Chicago, Burlington & Quincy Ry.*, 412 U.S. 401, 413, 93 S.Ct. 2169, 2176, 37 L.Ed.2d 30 (1973). Indeed, replacements of existing facilities are not considered capital contributions. *See id.* In this case the combustion control equipment was purchased to retire obsolete equipment, and the other replacement units were just replacements.

Defendant's burden on summary judgment on this issue is not to establish that the replacement items were not contributions to capital, rather to show that plain-tiff cannot carry its burden to prove that they were. This plaintiff failed to do, and no genuine issue of material fact prevents grant of defendant's motion.

Plaintiff next asserts that the amounts in question would fall under I.R.C. §§ 118(a), (b)(1)(A), which provide that gross income does not include any "contribution in aid of construction." Plaintiff's argument is flawed for two reasons. First, the items replaced by plaintiff do not fall within a reasonable interpretation of section 118(b)(1)(A). Second, plaintiff does not qualify as a regulated public utility under I.R.C. § 118(b)(3)(C).

Although the Department of Treasury has yet to issue a regulation defining the statutory term " 'contribution in aid of construction,' " as mandated by I.R.C. § 118(b)(3)(A),[4] the statute, along with its legislative history, indicates that payments to replace isolated units of property do not fall under section 118(b). Section 118(b)(2)(C) requires that "accurate records ... [be] kept of the amounts contributed and expenditures made on the basis of the project for which the contribution was made and on the basis of the year of contribution or expenditure." As defendant argues, the use of the term "project" would have to relate to construction for it to be consistent with the statute as a whole. Plaintiff has not shown that the payments in question were related to any construction. Certainly the replacement of executive swivel chairs or a desk cannot be characterized as a "project" in that sense.

The legislative history reveals that Congress intended to exclude from a corporation's gross income contributions that went to specific construction projects. Several examples of what qualifies for contributions in aid of construction were provided in the Senate Report accompanying the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520 (1976):

> (1) A builder or developer *constructs* water lines and/or support facilities such as water filtration plants, water towers, etc., and turns such facilities over to a

---

**4.** Plaintiff relies on a proposed regulation 1.118–2, 43 Fed.Reg. 22,997 (1978), but the proposal was withdrawn on January 27, 1987. 52 Fed. Reg. 2,724–35 (1987).

regulated water or sewage disposal utility.

(2) A builder or developer furnishes the necessary funds to a regulated water or sewage disposal facility which uses those funds to *build* certain water or sewage facilities.

(3) *A builder or developer pays for the* water or sewage disposal *facility* (commonly referred to as an "advance"). In return for the qualifying utility agreeing to pay the developer a percentage of the receipts from the facilities over a fixed period. Where the total payments made to the developer are less than the cost of the facilities which are transferred to the utility, any difference is to be treated as a contribution in aid of construction.

(4) A customer pays a fee to reimburse the utility for lines, valves, pipes, or meters, or a customer *constructs* his own lines which are turned over to the water or sewage disposal utility.

(5) Governmental units furnish regulated water or sewage disposal utilities with relocation fee payments where the local jurisdiction requires that certain *construction* be done by the utility in order to achieve a desired purpose of the government unit, *e.g.*, tearing up an old road to be replaced by a new one may require replacement of certain underground pipes and lines, providing additional sewage disposal facilities as a result of drainage projects, etc.

S.Rep. No. 938, 94th Cong., 2d Sess. 435–36, *reprinted in* 1976 U.S.Code Cong. & Admin.News pp. 2897, 3439, 3864 (emphasis added). These examples illustrate construction. None of the replacement units in question partakes of such a nature. Thus, the amounts in question do not fall under section 118(b)(1)(A).

Finally, defendant contests plaintiff's eligibility concerning I.R.C. § 118(b)(3)(C):

The term "regulated public utility" has the meaning given such term by section 7701(A)(33), except that such term shall not include any such utility which is not required to provide electric energy, gas, water, or sewage disposal services to members of the general public ... in its service area.

The plain meaning of this statute disqualifies plaintiff as a regulated public utility for section 118(b) purposes. Plaintiff argues that it is included because it services customers (sponsoring companies), which, in turn, resell the electric energy to members of the general public. Plaintiff also argues that since DOE and the sponsoring companies are its only customers in its service area, it should be considered a regulated public utility for section 118(b) purposes. Plaintiff is asking the court to broaden Congress' definition. The statute is explicit and only applies to those public utilities that are required to sell to the general public. If Congress had intended to include those utility companies that were required to sell to other utilities, as opposed to consumers in general, Congress could have expanded the definition accordingly.

Since plaintiff was not a regulated public utility for purposes of section 118(b)(3)(C), even if plaintiff's argument that such payments for replacement units were not taxable were valid, plaintiff would not be eligible for such an exclusion. Defendant's motion for summary judgment is granted on this ground.

## III. *Depreciation*

### FACTS

As discussed in the first part of this opinion, on May 4, 1951, plaintiff and DOE executed a 25–year contract to provide electricity for the Paducah Project through the construction of the Joppa Plant. Plaintiff financed all six units of the Joppa Plant by selling 25–year bonds to insurance companies with plaintiff making level payments to a 25–year sinking fund for payment of the bonds and interest thereon. Pursuant to its contract with plaintiff, DOE was to purchase a sufficient quantity of electricity so that payments would meet substantially all of the interest and amortization requirements of the 25–year sinking-fund mortgage debt. The sponsoring companies were obligated for the balance.

Section 3.06 of the original contract set out the parties' understanding that plaintiff was to obtain a private letter ruling authorizing depreciation of its facilities on a 25-year sinking-fund basis. This method of depreciation allowed plaintiff to match income and deductions. Plaintiff received from DOE and the sponsoring companies payments to cover financing the debt; as the amount of plaintiff's repayment of principal increased over time, the sinking-fund method of depreciation provided plaintiff increasing deductions for depreciation to yield deductions in the approximate amount of the principal paid. Since DOE was obligated contractually to pay plaintiff a specified rate of return after taxes, per section 3.06, this depreciation method lowered the cost of power to DOE. Had plaintiff been unable to obtain IRS approval of the 25-year sinking-fund method of depreciation, section 3.06 provided that the monthly rates charged DOE would increase to effect the same result.

Plaintiff requested a private letter ruling authorizing the use of a 25-year sinking-fund depreciation method for the projected Joppa Plant and new units. Plaintiff explained in its August 1, 1951 request for a letter ruling that the 25-year period was coterminous with its contract to deliver power to DOE, and a copy of its contract with DOE was attached. Plaintiff represented that "the plant is to have four units" and proposed that the cost of "new units" will be depreciated "on a similar basis."

Priv.Ltr.Rul. (unnumbered) (Sept. 6, 1951), approved the method for the "projected" Joppa Plant and "related facilities." *Id.*[5] Relying on the ruling, the parties executed Modification No. 6 on July 23, 1953, covering construction of the full complement of six units and extending the contract term to 25 years from the date thereof.

Plaintiff depreciated units 1–4 of the Joppa Plant beginning with its 1954 federal income tax return, applying the 25-year sinking-fund method, utilizing a 3.32 percent semi-annual compounded interest rate. The 1955 tax return reflected the same procedure for units 5 and 6, except that a 3.75 percent semiannual compounded interest rate was applied. The depreciation method, geared to the term of the contract, was consistent with the 1951 private letter ruling.

In June 1972 plaintiff placed in service electrostatic precipitators at an acquisition cost of $11,681,694 pursuant to order of the Illinois Pollution Control Board. The precipitators were financed by mortgage debt that was to be retired by sinking-fund payments ending on December 15, 1979. The depreciation was calculated . commencing with plaintiff's 1972 tax return over seven and one-half years under the sinking-fund method on the basis of a 10 percent interest rate compounded semiannually.

During that same year, DOE informed plaintiff of its desire to extend the contract ten years beyond the December 10, 1977 expiration date to December 31, 1989. By letter of August 18, 1972, plaintiff set out the terms and conditions of the proposed extension. Two and one-half years later, on February 3, 1975, Modification No. 11 was executed extending the life of the contract to December 31, 1989.

A waste treatment facility costing $1,237,162 was added to the Joppa Plant in December 1973, financed by short-term notes also to be repaid by December 15, 1979. Beginning with its 1974 tax return, plaintiff depreciated this addition under a straight-line method over the six years remaining under the terms of Modification No. 10. Both the precipitators and waste treatment facility were depreciated to co-

---

**5.** The policy underlying plaintiff's letter ruling was later confirmed under other circumstances. A separate public utility, Ohio Valley Electric Corporation ("OVEC"), had received a private letter ruling dated December 29, 1952, which authorized an equivalent sinking-fund method for OVEC's plan to provide electricity to a similar diffusion plant. Although private letter rul-

ings may not be relied upon by another party, I.R.C. § 6110(j)(3); Treas.Reg. § 601.201(1)(1) (1983), plaintiff points out that the IRS reaffirmed its ruling as to both plaintiff and OVEC in the 1970's when the IRS retracted a proposal to adjust depreciation of OVEC's facilities from 25 to 40 years.

incide with the increasing amounts paid by DOE and the sponsoring companies to cover principal repayments on the mortgage debt during the 25–year life of the contract, although it had been extended from 1979 to 1989.

During a 1976 examination of plaintiff's 1969–1974 tax returns, the IRS proposed to rescind the 1951 letter ruling and extend the useful life of the six units of the Joppa Plant and the precipitators and waste treatment facility, changing the ending depreciation date from December 1979 to May 31, 1993, using the straight-line method. A letter from Robert Seamans, Jr., DOE Administrator, to Treasury Secretary William E. Simon objected to revocation of the 1951 letter ruling based upon the cooperative effort by DOE and plaintiff. The IRS withdrew its adjustment proposal on November 2, 1977.

In 1981 plaintiff was subjected to review of its returns for 1977–1979, and the same scenario was repeated with new administrators. The IRS proposed to extend the depreciation term only for the Joppa Plant's precipitators and waste treatment facility. The Secretary of DOE, James B. Edwards, wrote to Treasury Secretary Donald T. Regan, on October 8, 1982, again expressing DOE's view that the proposed adjustments were "inconsistent with the policies underlying the 1951 ruling and the contractual relationship between EEI and the Federal Government," and that "the proposed IRS action undercuts the decision reached at the highest levels for private industry to work with the Government for national needs...."[6] The different cast of government players generated a new denouement.

On December 23, 1983, the IRS retroactively revoked use of the sinking-fund method for the years 1977–1982 and extended the useful lives for the precipitators and waste treatment facility. Further discussions were then held with plaintiff. For the precipitators the IRS assigned a 14½–year useful life spanning July 1972 to December 31, 1986, depreciable on the double-declining balance method beginning in 1977. The IRS computed depreciation for the waste treatment facility under a straight-line method, based upon a 15–year useful life commencing in 1973 and ending on December 31, 1988.

Defendant argues that plaintiff proposed or acceded to the adjustments in a letter from plaintiff's auditors of December 16, 1983. The letter reserves plaintiff's "rights to file claims for refund with respect to its tax years 1975 through 1982," and the unrefuted deposition testimony of its auditor confirms plaintiff's position.

## DISCUSSION

Depreciation deductions permit a reasonable allowance for the exhaustion, wear and tear of property used in trade or business. I.R.C. § 167(a). A reasonable allowance can be computed under a variety of methodologies:

(1) the straight line method

(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),

(3) the sum of the years-digits methods, and

(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

I.R.C. § 167(b)(1)–(4).

An asset's useful life is "not necessarily the useful life inherent in the asset," but is

---

**6.** Plaintiff contends that these agency letters constitute party admissions upon the IRS since the Government is technically a single party. *Maryland Savings–Share Ins. Corp. v. United States,* 226 Ct.Cl. 487, 499 n. 9, 644 F.2d 16, 23 n. 9 (1981), stands for the proposition that agency views do not bind the Department of Justice,

either as opinions from client to counsel or opinions on questions of law. Moreover, the statements are not views of fact, but policy statements explaining the repercussions of revoking the 1951 private letter ruling on the rate or other payments for which DOE will be obligated.

the period over which the asset is "useful to the taxpayer in his trade or business or in the production of his income." Treas. Reg. § 1.167(a)–1(b) (1983). The regulation also outlines factors for determining the period of useful life, including:

> (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climate and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements.

*Id.*

■ Plaintiff applied the sinking-fund and straight-line methods on a 25-year basis to implement the parties' contract to debt finance 100 percent of plaintiff's facilities with level repayments, match depreciation expense with debt reduction, and maintain the rates payable by DOE at a low level. However, plaintiff's rationale for doing so was to measure useful life by the life of the contract at the time the depreciable assets were placed in service. Defendant argues that allowing depreciation to be geared to a period of financing is inconsistent with the notion of useful life. For example, defendant postulates, two identical assets placed in service at the same time could be assigned different depreciation lives based upon whether the items were bought under an installment plan or purchased with cash. Plaintiff disputes that the useful lives of the precipitators and waste treatment facility were geared directly to a financing arrangement, maintaining that it based useful life on the contract's profitability.

The contract and financing arrangements are not dispositive. New ventures require coordination of both elements, each dependent upon the other. The basis upon which plaintiff and DOE devised the prospective depreciation plan was approved when the IRS issued the 1951 letter ruling, and plaintiff is correct that the IRS was asked to approve tying depreciation to the provision of power to DOE over 25 years, not to the financing arrangements.

The first inquiry is whether the letter ruling reaches the precipitators and waste treatment facility. The letter ruling applies, by its terms, to the Joppa Plant "and related facilities." The projected plant is described in plaintiff's request for the letter ruling as four units (later six). A unit consists of a boiler and turbine generator. Plaintiff asked for coverage for new units. The letter approved a 25-year depreciation period for the Joppa Plant consisting of six units. It did not approve other additions to the plant (even one required by state law) made almost 20 years after the six units were put into service.

Although for earlier tax years, the IRS took the position that the 1951 letter ruling applied to the precipitators and the waste treatment facility, the IRS does not forfeit its challenge in respect of later years. *See Recordak Corp. v. United States,* 163 Ct.Cl. 294, 297, 325 F.2d 460, 461 (1963). The IRS' difficulties in living with the 1951 letter ruling are only material to whether it can be revoked retroactively as to the precipitators and waste treatment facility. However, whether or not that is the case, the result would be the same, since the recent additions are not within its intendment.

■ Assuming, *arguendo,* that the 1951 letter ruling were construed to include the precipitators and waste treatment facility, the question becomes whether the IRS could revoke it retroactively. "A [letter] ruling . . . may be revoked or modified at any time. . . ." IRS Procedural Rules, Treas.Reg. § 601.201(1)(1) (1983). However, the IRS has limited its own discretion in Treas.Reg. § 602.201(1)(5) to revoke such rulings retroactively:

> Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling if (i) there has been no misstatement or omission of material facts, (ii) the facts subsequently

developed are not materially different from the facts on which the ruling was based, (iii) there has been no change in the applicable law, (iv) the ruling was originally issued with respect to a prospective or proposed transaction, and (v) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment.

Defendant concedes that plaintiff satisfies almost all conditions of this regulation, since plaintiff's proposal was completely prospective and contained no omissions or errors and the subsequent approved ruling was relied upon in good faith without any changes in the applicable law. However, defendant presents a multi-front offensive supporting revocation, arguing that 1) the letter ruling only applied to the original Joppa Plant and not the subsequent additions; 2) the facts surrounding the plant's operation have changed substantially; and 3) since plaintiff exercised its right to extend the contract with DOE, the period of depreciation, if tied to plaintiff's contract, must also be extended.

The first argument has been addressed apart from considerations of whether the IRS can change the basis and terms for depreciating the precipitators and waste treatment facility through retroactive revocation of the 1951 letter ruling.

Defendant's next two contentions, regarding the circumstances surrounding the issuance of the letter ruling and the extension of plaintiff's contract, essentially urge that circumstances materially differ from those when the 1951 letter ruling issued. The material difference consideration, the only element of the Treas.Reg. § 601.201(1)(5) standard not conceded by defendant, allows retroactive application if subsequent facts have developed that are "materially different from the facts which the ruling was based." *Id.*

Defendant begins by summarizing the physical and social changes that have occurred since 1951:

[F]acts have changed dramatically in the 30 years since the 1951 ruling. The facts that made it no longer possible to conclude that the contract life was the principal determinant of useful life were: the contract was modified to permit EEI's sponsors to take surplus power, the dramatic national increase in demand for electricity, and the creation of electric grids. The plant is no longer isolated and has no lack of alternative customers after the contract's expiration.

Ltr. from Roscoe Egger, IRS Commissioner, to Donald Hodel, Secretary of DOE (Jan. 27, 1984). Even if operational conditions have not substantially changed, defendant argues that plaintiff's right to extend the term of the contract constitutes a material difference. Contrary to defendant's assertion, plaintiff and the Secretary of DOE had the mutual right to negotiate an extension of the contract term ten years beyond December 31, 1979, to December 31, 1989.

The parties cite *Massey Motors, Inc. v. United States,* 364 U.S. 92, 107, 80 S.Ct. 1411, 1419, 4 L.Ed.2d 1592 (1960), as providing the standard for depreciation: "[T]he useful life of the asset [should] be related to the period for which it may reasonably be expected to be employed in the taxpayer's business...." Plaintiff's contract was to expire in 1979. The new additions were placed in service in June 1972 and December 1973, and the useful lives, based upon the remaining term of the contract, were seven-and one-half years and six years, respectively. Thus, accepting plaintiff's position that the new facilities were geared to plaintiff's expected profitability period, the length of plaintiff's contract at that time cannot provide a profitability time-line because plaintiff's contract with DOE will be continuing through 1989.

The Claims Court and the Federal Circuit have not had an opportunity to address what constitutes a material difference. Other circuits have contributed little to the interpretation of this language. *See, e.g., Boggs v. Comm'r,* 784 F.2d 1166, 1169–70 (4th Cir.1986) (departure of two employees participating in trust not a material difference when union pension fund and trust as a combined plan were qualifications for operation); *Lansons, Inc. v. Comm'r,* 622

F.2d 774, 776–77 (5th Cir.1980) (employment turnover resulting in greater benefits to remaining participants not material difference where trust application disclosed the transient nature of the business).

The IRS Procedural Rules provide an example particularly apt to plaintiff's position:

*If a ruling is issued covering a continuing action or a series of actions* and it is determined that the ruling was in error or no longer in accord with the position of the Service, the Assistant Commissioner (Technical) ordinarily will limit the retroactivity of the revocation or modification to a date not earlier than that on which the original ruling was modified or revoked. To illustrate, if a taxpayer rendered service or provided a facility which is subject to the excise tax on services or facilities, *and in reliance on a ruling issued to the same taxpayer did not pass the tax on to the user of the service or the facility, the Assistant Commissioner (Technical) ordinarily will restrict the retroactive application of the revocation or modification of the ruling.*

Treas.Reg. § 601.201(1)(7) (emphasis added).

The letter ruling was sought and relied upon by plaintiff to implement a contract that reduced electrical charges to DOE, to wit, the approved depreciation method was incorporated into plaintiff's rate structure. Additionally, the 1951 letter ruling stated that any "revisions will not be applied retroactively beyond the income tax return last filed." If the continuing action or series of actions is viewed ultimately as reducing the charges to DOE by matching income and deductions to plaintiff, plaintiff makes a strong point. If the continuing action or series of actions that the 1951 revenue ruling is designed to cover is viewed as allowing additional facilities to be bought under the 25–year umbrella contract term plaintiff loses, since the contract period was extended by ten years.

The first alternative cannot prevail. It is too attenuated to assume that the 1951 letter ruling applied to additions to a plant made within ten years of the expiration of the life or profitability of a 25–year contract, but not to an extended contract term. In other words, the IRS was not blessing a depreciation method to coincide with a superceded contract term no matter when additional facilities were added in order to maximize plaintiff's depreciation deductions and thereby lower the rates payable by DOE. Indeed, plaintiff justifies the 25–year term as the plant's profitability without reference to the underlying arrangements for financing and structuring rates. Therefore, assuming that the 1951 letter ruling applied to the precipitators and waste treatment facility (as to which the court has ruled in the negative), it is held that the IRS could revoke the letter ruling retroactively. Because the 1951 letter ruling stipulated that any revocation was effective only with respect to the last return filed, however, the IRS would be so limited.

The irony of litigating this issue is that it is the most pointed example of DOE's obligations to pay plaintiff regardless of the outcome of this litigation. Section 3.04 of Modification No. 11 (which has remained substantially unchanged since its inception as section 3.06(3) of Modification No. 6, which, in turn, is based on section 3.06 of the contract submitted with the request for the 1951 letter ruling) states:

*Adjustment in Event of Change in Deduction for Depreciation.* The deduction of depreciation for Federal income tax purposes on the basis referred to below in this Section 3.04 constitutes a part of the basic cost structure of this Agreement and of the furnishing of facilities for the supply of service hereunder, and therefore the obligation of ... [DOE] under this Section 3.04 is a portion of such basic cost structure. If the ruling of the Bureau of Internal Revenue dated September 6, 1951, permitting the deduction of depreciation for Federal income tax purposes on the bases therein stated, should be reversed or rescinded, with the result that Company should not be permitted to deduct for Federal income tax purposes full depreciation on such bases on its depreciable facilities of the Joppa Plant, *as such facilities may*

*be expanded as provided in this Agreement,* the parties will enter into appropriate amendments or supplements to this Agreement to provide that ... [DOE] shall thereafter at such intervals and during such periods of time as may be from time to time agreed upon make adjusted payments to Company for power and energy in amounts estimated to be adequate to provide Company with funds, together with the applicable portion of the fixed charges (Component (A)) of the base demand charge, sufficient to maintain the intended relationship between depreciation and debt retirement, to comply with the sinking fund provisions applicable to the existing indebtedness and other indebtedness incurred by the Company, *and to provide net income to Company substantially equivalent to the net income it would have earned had such change in the ruling not occurred.*

(Emphasis added.)

Defendant has represented that this clause has no effect, citing section 165(b) of the Atomic Energy Act of 1954, Pub.L. No. 703, 68 Stat. 919, 951 (codified at 42 U.S.C. § 2205(b) (1976)):

No contract entered into under the authority of this chapter shall provide, and no contract entered into under the authority of the Atomic Energy Act of 1946, as amended, shall be modified or amended after August 30, 1954, to provide, for direct payment or direct reimbursement by the Commission of any Federal income taxes on behalf of any contractor performing such contract for profit.

The depreciation adjustment clause appeared in the parties' contract, at the very least, by execution of Modification No. 6, on July 23, 1953. Thus, plaintiff's safeguarding clause essentially assures recovery regardless of the decision on the merits. However, even if the Atomic Energy Act applied, the contract provision reimbursing plaintiff for tax liability would be viable.

The legislative history of section 165(b) of the Atomic Energy Act indicates that prohibition against "direct payment or reimbursement" was to be construed strictly. When section 165(b) was debated, Senators Hicken, Cooper, and Gore specifically discussed the contract in this litigation and plaintiff's method of incorporating and calculating federal income taxes in the rate structure. 100 Cong.Rec. 11,983 (1954). The final version of section 165(b) inserts the word "direct" in front of the words "payment" or "reimbursement." *Compare* 100 Cong.Rec. 11,982 (1954), *with* 68 Stat. 951.

The conference report further reiterates the direct-indirect distinction:

The Senate amendment added to the House bill a provision (sec. 170) prohibiting the Commission from entering into a contract providing for the direct payment by the Commission of Federal income taxes on behalf of any contractor or for any payment to such contractor as reimbursement for any Federal income taxes paid by such contractor. The conference substitute limited the prohibition to the direct payment or direct reimbursement by the Commission of any Federal income tax, and made the prohibition as so limited a part of section 165. *It was the intention of the committee of conference to prohibit the direct payment of Federal income taxes to contractors of the Commission, but it was not the intention of the committee of conference to bar inclusion of such taxes in the computation or adjustment of the base rate or cost structure of the Commission contract.*

H.R.Conf.Rep. No. 2666, 83d Cong., 2d Sess. 50 (1954), U.S.Code Cong. & Admin. News 1954, pp. 3456, 3537, *reprinted in* 100 Cong.Rec. 14,867 (1954) (emphasis added).

A Memorandum of Understanding between plaintiff and DOE's contracting officer was executed on October 10, 1986, reaffirming that an increase in plaintiff's federal tax liability for depreciating the precipitatprs and waste treatment facility, would give rise to an equitable adjustment. Additionally, DOE's chief counsel provided a memorandum on the same date confirming

the authority of DOE to execute the memorandum and reaffirming the inapplicability of section 165(b) of the Atomic Energy Act. Even if the effective date of the Act, its express language, and its legislative history, all of which favor plaintiff, are ignored, defendant probably could be equitably estopped from enforcing the Act based upon the actions of the contracting officer and DOE's chief counsel. Defendant nonetheless prevails on its cross-motion on this ground.

## IV. *Repairs*
### FACTS

The following facts are either stipulated or found after trial. From 1977 through 1980, plaintiff carried out a systematic substitution of all the horizontal elements within the economizers of its six boilers. The replacement plan was an economic decision, based upon past maintenance experience, to avoid forced outages.[7]

In a power plant, the boiler turns water into steam, and the steam is then used to power the turbine, which, in turn, rotates the generator. After the steam has passed through the turbine, the steam is condensed back into water and then pumped back to the boiler, completing a cycle of events. The boiler is 162 feet high, 74.6 feet deep, and 56 feet wide.

As part of the process whereby the water is heated into steam, the water is passed through the economizer. The economizer is a walled part of the boiler through which the discharged hot gases produced by the boiler are released to the stacks after the principal part of their heat has been used to produce steam. Using the hot gases, the economizer pre-heats water being returned to the boiler from the turbine before the water actually is converted into steam.

According to plaintiff's President George A. Rice, Jr., an economizer is an "add-on item" that, when attached to a coal-firing boiler, improves the unit's overall efficiency by conducting additional heat from the gases produced by the fossil fuel. However, the boiler, not the economizer, produces the steam. The economizer is essentially a large walled-in box that contains both vertical and horizontal tubing. The horizontal tubing is referred to as the "horizontal elements."

Water is heated by the hot gases from the boiler furnace while passing through the entire economizer circuit. From the boiler the water enters the horizontal elements at the bottom of the economizer through an inlet header pipe. It rises vertically and discharges into a ring intermediate header, leaving through vertical wall tubes, then rises upward and is collected in an outlet header and thereafter passed into the boiler steam drum.

Each economizer contains one set of 162 horizontal elements. The portion of an economizer consisting of horizontal elements measures approximately 40 by 20 by 7 feet. An individual element of carbon steel tubing measures 5 feet 9 inches by 21 feet 2 inches to 7 feet by 21 feet 4 inches. The old horizontal elements, placed in the units during construction of the Joppa Plant, were designed with carbon steel protusions, on both sides of the round tube, known as fins. These finned tubes measured 2 inches in diameter. The spacing between each tube was actually at a diagonal, rather than horizontal position, with approximately 1¼ inches between each tube. Each set of horizontal elements possesses 44,200 linear feet of tubing, which is 86 percent of the total 51,500 linear feet of tubing within an economizer. Each element itself contains 273 feet of linear tubing. Plaintiff's expert Paul Moser, whose expertise in installing and maintaining boilers such as plaintiff's spans 30 years, agreed with the statement that an element is a rack made up of a continuous bent-tube configuration. Mr. Moser estimated the weight of one element as not quite one ton.

This illustration depicts a typical unit, including the boiler and economizer:

---

**7.** A forced outage occurs when the generating unit is shut down unexpectedly in order to perform unscheduled maintenance. Since temperature in the economizers is over 700°, the boiler cannot be operated while this repair work is being accomplished.

**C-E REHEAT STEAM GENERATOR**

CAPACITY—1,200,000 LB PER HR AT 1925 PSI AND 1055 F STEAM TEMP. REHEAT TO 1005 F.

Designed and Built by COMBUSTION ENGINEERING, INC., New York

**JOPPA STEAM ELECTRIC STATION**

Electric Energy, Inc., Joppa, Ill.

IBASCO SERVICES INC., Consulting Engineers

**PLAINTIFF'S EXHIBIT 6A**

Since their installation in 1953, the finned tubes had experienced erosion leading to leaks caused by coal burning residue known as fly ash. This ash travelled between the tubes, impacting at high velocities, and would plug passages between the tubes creating higher velocities and directing more continuous impacts on a single surface area, thereby causing erosion. The

leaks, in turn, caused forced outages. Mr. Moser testified that the vertical elements which made up only 14 percent of the tubing in each economizer, do not experience erosion to the same degree as the horizontal elements.

Prior to 1977 plaintiff spot-repaired the leaks either by pad welding (manually adding new metal onto a worn area by an electric arc process) or by cutting out the worn tubing section and grafting on a new section of tubing. Messrs. Rice and Moser characterized pad welding as temporary, and Mr. Moser also viewed spot replacing with new tubing as temporary. As the number of leaks and patches or new tube inserts increased and the location of the wear appeared in the lower parts of the tubes, which were more difficult to access, the number of forced outages increased, and spot repairs no longer were economical. Plaintiff had considered and rejected as not economically feasible the option of removing all the horizontal elements in each unit, checking each tube, sand blasting them, and repairing the thin tubes. The option to replace all the horizontal elements in all six of the economizers was elected, and plaintiff devised a phased replacement program to implement that decision.

Both the design and array of the new horizontal elements were different. The tubes in the new sets of 162 horizontal elements possessed no fins and more perfect horizontal spacing. The finless design and different positioning were implemented to decrease the vulnerability of the horizontal elements to fly ash damage. To compensate for the absence of heating surface lost by elimination of the fins, two additional loops were placed in the horizontal elements. This installation, which was completed in all the economizers in the six units, resulted in a substantial reduction of leaks.

The 1977–1980 economizer element replacement program cost $2,294,416. The annual expenditure was

*1977*—$264,284
Boiler 6—81 tubes
*1978*—$394,264

Boiler 6—81 tubes
Boiler 2—81 tubes
*1979*—$754,386
Boiler 1—162 tubes
Boiler 3—162 tubes
*1980*—$981,482
Boiler 4—162 tubes
Boiler 5—162 tubes
Boiler 2—81 tubes

Plaintiff reported the costs of replacement as a deductible expense on its income tax returns for the years incurred, but the IRS treated the depreciated expenditures as capital items.

## DISCUSSION

██ A deduction may be taken for ordinary and necessary expenses in carrying on a trade or business, I.R.C. § 162(a), but not for any permanent "improvements or betterments made to increase the value of any property." I.R.C. § 263(a)(1). Outlays for repairs may be either an expense deduction or a capital expenditure based upon the nature and extent of the repairs. The two applicable Treasury Regulations provide, respectively, in pertinent part:

> The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in a ordinarily efficient operating condition, may be deducted as an expense.... Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated ... or charged against the depreciation reserve if such an account is kept.

Treas.Reg. § 1.162–4 (1980).

> In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures....

Treas.Reg. § 1.263(a)–1(b). One treatise describes fixing the dividing line between

capital expenditures and repairs as "an almost insoluble problem inasmuch as questions of degree are involved." 6 J. Mertens, *Law of Federal Income Taxation* § 25.56, at 216 (Rev.1985).

> In determining the characterization of a particular item it is also necessary to ascertain the purpose for which the expenditure is made. If its purpose is merely to keep the property or a machine in efficient operating condition and is accordingly in the nature of a maintenance charge, it is ordinarily deductible....

*Id.* at 217. The inquiries in this case are whether the repairs appreciably prolonged the useful life of the repaired assets or adapted the assets to a new or different use.

Plaintiff argues that the horizontal elements are an integral, but small, part of each boiler—indeed, that the horizontal elements are a component of an economizer, which itself is a component of each boiler. Plaintiff also argues that the replacement program improved maintenance operations in that the repair brought each piece of property only back to its original operating performance, but did not add to each boiler's value or enable a new or different use. Rejoining that the economizer is a unit of property, defendant argues that the sheer amount of the expenditure, the prolonged life of the economizers, and the improved functioning of the economizers support a designation of a capital expenditure rather than a repair.

The sheer amount of the expenditure is not a reliable focal point for this case. Judge Miller in *Cleveland Electric Illuminating Co. v. United States*, 7 Cl.Ct. 220, 224 (1985), described "the fact that a substantial expenditure is likely to give a long lived benefit ..." as "an important, if not dominant, factor" in determining whether a multi-million dollar outlay should be classified as a repair rather than a capital expenditure. Since one new boiler would cost $17–20 million, however, revitalizing the horizontal elements of each economizer at an approximate cost of $380,000 does not constitute an unusual repair bill.

Plaintiff contends that an economizer is not a piece of equipment separate from the boiler, pointing to the evidence that an economizer cannot operate alone and constitutes a part of the boiler. Mr. Moser described the boiler as "99 percent tubing oriented" and estimated the proportion of the tubing in the horizontal elements as about 10 to 15 percent of the entire complement of tubing. According to Mr. Moser, since the economizer is just a portion of the overall boiler, replacement of the horizontal elements "improv[ed] the tendency for this portion of the unit to last, but ... [did] nothing for the overall furnace."

The Supreme Court has held that an outlay for a separate and distinct asset is a capital expenditure. *Commissioner v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 354, 91 S.Ct. 1893, 1899, 29 L.Ed.2d 519 (1971). Plaintiff's property catalog lists "Economizers" under the heading "Boilers" as distinct units of property. To accept plaintiff's position that the economizers are not units of property would defy logic. Since an economizer is not vital to the boiler's production of steam, it must serve a separate function, to wit, enhance the overall unit's ability to convert water into steam. The economizer as an enhancement of the generating process cannot be viewed as part of the boiler. Mr. Rice termed the economizer an "add-on item." Thus, an economizer is an individual unit of property, and any improvement need only relate to that specific piece of equipment.

*Libby & Blouin, Ltd. v. Commissioner*, 4 B.T.A. 910 (1926), is distinguishable. Due to chronic corrosion, the taxpayer in one year replaced all tubing in a sugar evaporator. The board held that since the tubes constituted a part of the evaporator, their renewal did not prolong the life of the evaporator. All the tubing, however, was part of the first or second effect stages of the evaporator, and there was no difference cited to susceptibility to corrosion depending on in what effect stage the tubing was positioned. In the case at bar, the economizer is a part of the boiler but is an add-on part, and the tubing within the horizontal elements is more susceptible to ero-

sion than the vertical tubing within the economizers themselves. It is also not insignificant that *Libby & Blouin* was decided in 1926 when the tubes had a life span of from two to four years. This factor is discussed below.

Plaintiff then points to the evidence that the horizontal elements do not constitute all of an economizer.[8] Nonetheless, they are a major component, and the horizontal tubing operates distinctly apart from the vertical and poses more acute maintenance problems.

The prolonged useful life of the economizers alone supports capitalization. The correction of a defect which contributes to prolonging the life of equipment is a replacement, not a repair, and must be capitalized. *See Hudlow v. Comm'r*, 30 T.C.M. (CCH) 894, 923 (1971) (replacement of major parts put forklift trucks into such condition as to no longer be unduly susceptible to breakdowns); *Almac's Inc. v. Comm'r*, 20 T.C.M. (CCH) 56, 59 (1961) (retubing of boiler after 27 years extended useful life by more than a year or or two); *Ruane v. Comm'r*, 17 T.C.M. (CCH) 865, 871 (1958) (substantially rebuilding coke ovens gave them a new life expectancy of three to four years). Mr. Moser testified that, although many factors affect the life of an economizer—such as metallurgy and water composition—plaintiff's economizers had not experienced any of these problems. He gave the opinion that the horizontal elements were probably the governing factor in the life of an economizer. Finally, Mr. Moser testified that the economizers have an appropriate operating life of 25–30 years and that the new horizontal elements, which would most likely wear down before any other part of an economizer, possess an operating life of the same number of years. According to Mr. Moser "[Plaintiff's President] certainly helped himself and in looking at the design that I know he had there today, I would expect the useful life of the horizontal elements almost to be extended out to maybe [forty] years or better because he has eliminated the inherent problem of the tight spacing and the staggered arrangement."

Improvement of preexisting equipment is suggestive of capitalization. The Court of Claims has applied capitalization when a repair results in a "substantial functional improvement" through application of a superior part. *Missouri Pacific RR. v. United States*, 204 Ct.Cl. 837, 854, 497 F.2d 1386, 1396 (1974); *see also Southern Pac. Transp. Co. v. Comm'r*, 75 T.C. 497, 718 (1980). Plaintiff's own statistics demonstrate that leaks in the horizontal elements caused by fly ash erosion significantly decreased after 1980, with 13 and 12 leaks occurring, respectively, in 1981 and 1982, compared with 25 or more per year in each of the five years preceding commencement of the replacement program in 1977. Mr. Moser explained that the new finless design was state of the art and, although the fin model was still utilized, the new tubes would require less maintenance. Although the boilers did not function differently, their performance was improved in that it was not interrupted by frequent forced outages.

Plaintiff denies that replacement of the horizontal elements resulted in a betterment, arguing that the efficiency of the economizer and the overall boiler decreased because of the new finless tube design. Plaintiff first takes the position that since the economizer has no function, *i.e.*, it cannot independently produce steam without the boiler, that no improvement can be found unless the betterment is to the boiler. Assuming that the entire boiler is the focus, plaintiff argues that no betterment exists, since the boiler did not produce any more steam after installation of the new tubes.

According to Mr. Rice, when plaintiff began replacing all the horizontal elements, it had some doubts whether the new economizers would be as efficient. Mr. Moser testified that a 40° increase in exit tempera-

---

8. Plaintiff classified as maintenance expenditures for its boilers "[replacement] of parts representing less than the complete economizer, such as tubes, fins, headers, connections, etc."

However, it is the court's province to determine whether the replacement of all the horizontal elements in all six units constituted a repair of a recurring nature.

ture represents an efficiency loss in the boiler of one percent. Plaintiff offered efficiency tables indicating that the exit temperatures of the steam were higher after the finless tubes were installed. The data are incomplete because plaintiff tested only four out of the six units; of those tested, two exhibited differences of 7° and 16°, while the others read a difference of 23° and 29°. Even the highest figure of the four, the 29° increase, would represent less than a one percent efficiency loss. Mr. Rice testified that each boiler is unique; that a variety of factors affects exit temperature; and that there are five heat exchanges in the boiler, including one in the economizer. Noting that the temperature readings should vary at various points in the boiler, he acknowledged that the data offered measured only the exit temperature. Plaintiff's tests are inconclusive in respect of heat loss in the economizer alone.

Even if the data were more complete, the economizers still were improved. Plaintiff may have received less efficient economizers in respect of temperature conversion, but the equipment's overall maintenance frequency has decreased. This trade-off is an economic business decision of which Mr. Rice was aware when he made the decision to replace the economizers.

Overall the court deems this evidence more probative of prolonging the life of the economizers than constituting a betterment. Replacement of the horizontal elements allowed plaintiff to begin a new 20-plus-year repair cycle which reduced the probability of pluggage and erosion. The greatly reduced number of leaks since 1980, compared with the accelerating increase in leaks between 1953–1977, proves the point.

The court advised at trial that Mr. Moser's particularly candid expert testimony on cross-examination would be given great weight. This witness was instrumental in depicting how replacement of the horizontal elements alleviated for years what had become an acute maintenance problem. Mr. Rice's testimony was not to the contrary. The wholesale replacement of the horizontal elements prolonged the life of plaintiff's economizers and cannot be deducted as an expense, but must be capitalized. Defendant is entitled to judgment on this issue.

### CONCLUSION

Based on the foregoing, the parties' cross-motions for summary judgment are granted in part and denied in part. Plaintiff shall be refunded income tax and interest paid as a result of the IRS' treatment of the surcharge as gross receipts from sales. Defendant is entitled to summary judgment on plaintiff's claims concerning replacement units and depreciation, and judgment shall be entered for defendant on plaintiff's claim concerning replacement of the horizontal elements of the economizers. This determination having been made pursuant to RUSCC 42(c), the parties shall file a stipulation by December 15, 1987, as to the amount of net refund due plaintiff, if any. Defendant represented that its counterclaim would only come into play if plaintiff did not prevail on the replacement and repairs issues. Upon the filing of this stipulation, the Clerk of the Court shall enter judgment. Costs shall not be awarded.

IT IS SO ORDERED.

